**MISSOURI PAC. R. CO. v. HELLMICH, Collector of Internal Revenue.**

(Circuit Court of Appeals, Eighth Circuit. April 28, 1926.)

No. 7129.

**1. United States ⊙⊸40.**

Regulations of Internal Revenue Department have no force to create a tax or enlarge taxing statute.

**2. Statutes ⊙⊸219—Interpretation by executive department is entitled to weight, and in some circumstances re-enactment without change may be held to indicate approval of prior administrative construction.**

In construing statute, long interpretation thereof by an executive department charged with its enforcement is entitled to weight, and under some circumstances re-enactment without change may be held to indicate approval of prior administrative interpretation.

**3. Statutes ⊙⊸181(1), 184.**

Statutes must be construed in the light of true legislative intent, object, and purpose.

**4. Internal revenue ⊙⊸11—Railroad held not liable for tax on telegrams sent under contract with telegraph company entitling it to privilege of free service in stipulated amount until such free service was exhausted (Revenue Act 1918, § 500, subd. [f], section 501, subds. [a], [c], and section 502 [Comp. St. Ann. Supp. 1919, §§ 6309⅓a–6309⅓c]; Comp. St. § 8563).**

Under Revenue Act 1918, § 500, subd. (f), section 501, subds. (a), (c), and section 502 (Comp. St. Ann. Supp. 1919, §§ 6309⅓a–6309⅓c), and Regulations of Commissioner of Internal Revenue, Nos. 49 and 57, art. 9, imposing tax on telegraph messages, and in view of Comp. St. § 8563, railroad having contract with telegraph company, under which each was given the privilege of receiving free services of the value of $75,000 a year from the other *held* not liable for tax on such free service.

In Error to the District Court of the United States for the Eastern District of Missouri; Charles B. Faris, Judge.

Action by the Missouri Pacific Railroad Company against Arnold J. Hellmich, Collector of Internal Revenue. Judgment for defendant, and plaintiff brings error. Reversed and remanded, with directions.

James F. Green and Edward J. White, both of St. Louis, Mo. (M. U. Hayden, of St. Louis, Mo., on the brief), for plaintiff in error.

Charles T. Hendler, Sp. Atty. Internal Revenue, of Washington, D. C. (Allen Curry, U. S. Atty., and Claude M. Crooks, Asst. U. S. Atty., both of St. Louis, Mo., and A. W. Gregg, Solicitor of Internal Revenue, of Washington, D. C., on the brief), for defendant in error.

Before STONE, VAN VALKENBURGH, and BOOTH, Circuit Judges.

VAN VALKENBURGH, Circuit Judge. The Revenue Act of 1918, among other things, provided:

"Sec. 500. That from and after April 1, 1919, there shall be levied, assessed, collected, and paid, in lieu of the taxes imposed by section 500 of the Revenue Act of 1917: * * *

"(f) In the case of each telegraph, telephone, cable, or radio, dispatch, message, or conversation, which originates on or after such date within the United States, and for the transmission of which the charge is more than 14 cents and not more than 50 cents, a tax of 5 cents; and if the charge is more than 50 cents, a tax of 10 cents: Provided, that only one payment of such tax shall be required, notwithstanding the lines or stations of one or more persons are used for the transmission of such dispatch, message, or conversation. * * *

"Sec. 501. (a) That the taxes imposed by section 500 shall be paid by the person paying for the services or facilities rendered. * * *

"(c) The taxes imposed by section 500 shall apply to all services or facilities specified in such section when rendered for hire, whether or not the agency rendering them is a common carrier. * * * Nothing in this or the preceding section shall be construed as imposing a tax (1) upon the transportation of any commodity which is necessary for the use of the carrier in the conduct of its business as such and is intended to be so used or has been so used; or (2) upon the transportation of company material transported by one carrier, which constitutes a part of a railroad system, for another carrier which is also a part of the same system. * * *

"Sec. 502. * * * The returns required under this section shall contain such information, and be made at such times and in such manner, as the Commissioner, with the approval of the Secretary, may by regulation prescribe."

Comp. St. Ann. Supp. 1919, §§ 6309⅓a–6309⅓c.

The Commissioner of Internal Revenue prescribed the following regulations deemed pertinent to this inquiry. Article 9 of Regulations numbered 57:

"*Messages Transmitted under Contract.*— Where by contract a telegraph, telephone, radio, or cable company agrees, in consideration of the payment of a lump sum or of the performance of services, to transmit messages on frank, such messages are subject to the tax imposed by this section [500f of the act]. The tax on each such message is to be computed upon the amount of the regular established charge for the transmission of sim-

ilar messages for ordinary customers, calculated at the regular fixed rate provided in the tariffs of the transmitting carrier. The questions as to whether such messages relate to the operation of the business of the common carrier and whether they are 'on-line' or 'off-line' are immaterial. Thus a telegraph company agrees to transmit over its lines on a railroad line, all messages relating to railroad business 'free' and all such messages over its lines off the railroad line 'free' to an amount not exceeding ten thousand dollars ($10,000.00) per year calculated at its regular rates, and all messages over that amount at half rates in consideration of services to be performed by the railroad in the transportation of men and materials of the telegraph company. All such messages whether 'on-line' or 'off-line' and whether 'free' or at half rates, are subject to the tax provided by this section (500f) of the act. The tax must be computed, collected and paid upon each such message."

Regulation No. 49, issued by the Internal Revenue Department in 1920:

"If a telegraph or telephone line or lines along the line of any railroad company be necessary for the use of such railroad company in the conduct of the railroad company's business as such, and if the railroad company, under contract transports commodities necessary to maintain or operate such telegraph or telephone line, or lines, along the line of such railroad company, such commodities being intended to be, or having been so used, and the railroad company makes no charge for such transportation, the charges which, but for such arrangement, would have accrued upon such transportation, are exempt from the tax."

On the 24th day of October, 1911, the Western Union Telegraph Company and the predecessors of plaintiff in error, all common carriers engaged in interstate commerce, and subject to the act of Congress to regulate interstate commerce, entered into a written contract, the material parts of which are as follows:

"The telegraph company agrees to perform such telegraphic service between points on its lines in the United States, either on or off the lines of the railroad covered by this agreement, as the railway companies may desire, for messages pertaining to their railroad business, to be authorized by frank permitting all classes of messages and telegraphic letters in public use on the lines of the telegraph company, to be issued to such officers and agents of the railway companies as may be designated by their presidents or general managers; and the railway companies agree to perform promptly such transportation and distribution service over their railroads covered by this agreement as the telegraph company may require for its employés, supplies and material, whether for work or use along said railroads or beyond or off the lines of said railroads, and to furnish special trains, engines, crews and equipment for distribution service, and outfit, boarding and tool cars for work on the lines along said railroads, whenever required by the telegraph company. The transportation of employés to be authorized by passes to be issued by the railway companies on request of the superintendent or other authorized officer of the telegraph company.

"Such service performed by either party for the other shall be charged for at its or their regular current telegraph rates, or through or local transportation rates, as the case may be, for the class of service rendered. Services performed by either party for the other for which there are no regular or published rates, and not otherwise provided for in this agreement, shall be charged for at actual cost, as determined by the officers of the party rendering the service, plus not exceeding twenty-five per cent. (25%) of such cost. At the close of each contract year bills shall be rendered by each party to the other for all services performed by either party for the other during the year. If such bills therefor, rendered by either party to the other, exceed the sum of $75,000 in any contract year, the party receiving such service shall pay to the party rendering the same the amount of such excess, provided, that, in the event that each of the parties hereto is rendered bills for such services in excess of $75,000 in any contract year, the party in arrears shall pay to the other party the difference between the amounts of such accounts; and further provided that if the bills rendered by either party to the other for such services in any contract year do not exceed $75,000, there shall be no payment by either party to the other therefor."

This contract was in full force and effect between plaintiff in error and the telegraph company at the time of the enactment of the Revenue Act of 1918, to which reference has been made.

The Interstate Commerce Act (Comp. St. § 8563, et seq.), which forbids any common carrier subject to its provisions, directly or indirectly, by any special rate, rebate, drawback, or other device, to charge, demand, collect, or receive from any person or persons a greater or less compensation for any service rendered than it charges, demands, collects,

or receives from any other person or persons, for a like service, provides, further, that "nothing in this act shall be construed to prevent telephone, telegraph, and cable companies from entering into contracts with common carriers, for the exchange of services." Section 8563, Comp. St.

The arrangement made by the contract of October 24, 1911, although an apparent departure from the provisions of the original act against granting special rates or charges was thus recognized by Congress and approved by the Supreme Court, for the reason that the interdependence of such companies is very intimate. The railroads and the telegraph companies have grown together in mutual dependence; each is necessary to the other. The bargain between them is a very complex one and all the benefits derived on one side, including those of a pecuniary nature, form the consideration for all the benefits conferred upon the other. Postal Tel.-Cable Co. v. Tonopah R. R. Co., 248 U. S. 471, 39 S. Ct. 162, 63 L. Ed. 365.

Defendant in error made demand upon plaintiff in error in May and June, 1923, for taxes claimed to be due on account of franked Western Union messages transmitted during the period from March, 1920, to January, 1923, inclusive, aggregating $14,792.95. These taxes covered all messages sent, including the free service provided by the contract. Plaintiff in error paid these sums under protest, the sufficiency of which is conceded, and thereafter, in March, 1924, brought suit for the recovery thereof. It is agreed that plaintiff in error duly appealed to the Commissioner of Internal Revenue for refund, and that the Commissioner failed to render any decision or make any response to such appeal for more than six months after the same was presented to him. It is further agreed that if the court should find for the railroad company, judgment should be rendered in its favor for the sums claimed, to wit, $14,792.95. Upon submission to the court, on stipulation of parties waiving a trial by jury, a judgment was rendered in favor of defendant in error.

Plaintiff in error urges that the Revenue Act of 1918, and the Interstate Commerce Act above quoted, are in pari materia, and that the latter should be considered as governing the application of the former. To this we cannot agree, because the two acts do not deal with the same subject-matter. The parties are the same, but the subject-matter in the one case is taxation; in the other, the regulation and control of carriers. The latter act differentiates carriers from ordinary shippers permitting contracts for exchange service.

The language of this court in United States v. Railroad, 157 F. 321, 85 C. C. A. 27, 15 L. R. A. (N. S.) 167, 13 Ann. Cas. 893, is conclusive upon this question. Nevertheless, the Commerce Act is instructive and pertinent as revealing the attitude of the government toward contracts of this nature.

[1, 2] We also agree with the trial court that Regulation No. 57 has no force as creating a tax. That regulation is powerless to enlarge the act. We may also concede the general rule that long interpretation of a statute by an executive department charged with its enforcement is entitled to weight, and that under some circumstances a subsequent enactment without change has been held to indicate approval of prior administrative construction and interpretation; but this rule would apply equally to Regulation No. 49, whereby the telegraph company is, by interpretation, exempted from tax where the railroad company, under contract, transports commodities necessary to maintain or operate such telegraph lines along the line of the railroad company on the ground that the railroad company makes no charge for such transportation. In this respect, in our opinion, the interpretations disclosed by these two regulations are inconsistent. In this view, it is improbable that Congress had this feature in mind at all when it passed the later act of 1921 (42 Stat. 227), for certainly it cannot be said that the railroad did not charge for the transportation in the same sense as the telegraph company did for the messages. The situation presented is similar to that before the Supreme Court in George Iselin v. United States, 46 S. Ct. 248, 70 L. Ed. ——, decided March 1, 1926, in which it was held that such departmental construction cannot be given the force and effect of law.

[3, 4] The real question is did these messages upon which the tax was based come within the intendment of subdivision (f) of section 500 of the act of 1918? If we adhere strictly to the technical meaning of the language used, we might answer in the affirmative; but this law, as all others, must be construed in the light of the true intent, object and purpose of the legislation. It was not intended thereby to tax any service of this kind which was not rendered for hire; that is to say, for a return either in money or property. In other words, the term charge as used in the act is not a mere bookkeeping term. It means a return in tangible value, measured in money, according to the nature, length and destination of the message. It is so used in Regulation 49. When we say "we make no charge," we mean "we exact no payment."

This contract contemplated no payment at all for mutual services up to $75,000. The payments contemplated were upon the excess, or balance of excess, above $75,000. The charge on the books, in terms of dollars and cents, as applied to individual messages (and, of course, corresponding charges were made on the books of the railroad company for transportation furnished), was simply to keep a record for the purpose of ascertaining whether any chargeable excess should come into existence against either party to the contract. This appears from the annual settlements made. For the year ending August 31, 1920, the net transportation charges of the railroad against the telegraph company were $80,721.72. The total telegraphic charges for services furnished by the Western Union Company were $71,815.17. The excess of transportation charges over the free carriage allowed up to $75,000 was $5,721.72; but the excess of railroad service over telegraph service was $8,906.55. If the whole volume of service was subject to payment, settlement being made on general balances, the railroad should have demanded and received $8,906.55; but instead, in accordance with the terms of the contract, it received but $5,721.72. In other words, on each side, service up to $75,000 was free to be used, or not used, as desired. There was no purpose to charge for it. The fact that where mutual services were actually rendered in excess of $75,000 an appearance of payment, dollar for dollar, is presented, furnishes no controlling guide to ascertainment of the nature of the transaction. The consideration in this contract was not the reciprocal services themselves, on an established tariff basis, but the privilege or option to receive $75,000 worth of free service, should either or both so elect. If each party was, in effect, to charge at the tariff rates for all services without franking privileges, no contract would have been necessary.

This contract was made in 1911, before either the war or this war tax was thought of. It is in no sense self-serving, nor designed to defeat the revenue. As said in Postal Telegraph-Cable Co. v. Tonopah R. R. Co., supra, contracts of this nature have been nearly universal for 50 years. The apprehension that they can be employed at will to accomplish immunity from taxation is groundless. When the act was passed Congress could have expressly provided against such a result if it had been deemed necessary, or if such abuse should creep in, it can at any time be met by appropriate legislation. The trial court was admittedly in doubt on the question. It was finally controlled by the view that the contract involved a swapping of services, which, therefore, were for hire; but the contract up to $75,000 was a swapping of privilege rather than of service, and the mutual service up to that limit was free. This is demonstrated by the contemplated operation. If the railroad had handled no shipments for the telegraph company, but had sent messages not exceeding $75,000 in value, it would have paid nothing, and the telegraph company would have received nothing, although the latter would have rendered $75,000 worth of service and would have charged that amount on its books. The government seeks to convert a mere bookkeeping fiction into an item of income; but this is not permissible. The transaction must be viewed in its substantial, and not in its purely technical, aspect. Messages up to the amount of $75,000 did not constitute services rendered for hire, and are, therefore, exempt; those in excess of that amount are subject to tax.

The case is reversed and remanded, with directions to apply this rule. It is so ordered.