STATE EX. REL CROWN COACH COMPANY, v. PUBLIC SERVICE COMMISSION OF MISSOURI—185 S. W. (2d) 347

Kansas City Court of Appeals.   December 4, 1944.

*John P. Randolph, Lester G. Seacat,* and *June R. Rose* for appellant.

*Crouch & Crouch* and *Sam Mandell* for Respondent.

200

DEW, J.,—This is an appeal by the Public Service Commission from a judgment of the Circuit Court of Cole County reversing that Commission's order · granting the supplemental application of Vernon Walker and R. E. Reasons, doing business as the Yellow Cab Company of Neosho, Missouri, for extension under that company's Certificate of Authority No. 324.

Such facts as are not in dispute are as follows: In 1941, by its Certificate No. 2, issued by the Commission, the Crown Coach Company, a corporation of Joplin, Missouri, was authorized to operate intrastate as a passenger-carrying motor carrier over a regular route from Kansas City to Joplin, to Lanagan, and to the Missouri-Arkansas state line over U. S. Highway 71; also over Missouri Highway 88 from Lanagan to said state line. Such route on Highway 71 runs closely alongside of and parallel with practically the whole west boundary of Camp Crowder, a portion of which camp is between one and two miles south of Neosho, Missouri.

In March, 1942, the Public Service Commission of Missouri, appellant, issued its Certificate of Authority No. 324 on the voluntary application of Vernon Walker and R. E. Reasons, partners, doing business as the Yellow Cab Company of Neosho, to operate as motor carriers of passengers and to use therefor five-passenger cars, over irregular routes from Camp Crowder to all points in Missouri, and vice versa, subject to the provision that service should not be rendered between points of origin and destination on the route of a regular route carrier of passengers.

Section 5720, Session Acts, 1941, page 522, contains these definitions:

"(d) The term 'taxicab,' when used in this article, shall mean every motor vehicle designated and/or constructed to accommodate and transport passengers, not more than five in number, exclusive

of the driver, and fitted with taximeters and/or using or having some other device, method or system to indicate and determine the passenger fare charged for distance traveled, and the principal operations of which taxicabs are confined to the area within the corporate limits of cities of the state and suburban territory as herein defined.

"(f) The term 'suburban territory,' when used in this article, means that territory extending one mile beyond the corporate limits of any municipality in this state and one mile additional for each 50,000 population or portion thereof; *Provided,* that when more than one municipality is contained with (within) the limits of any such territory so described, motor carriers operating in and out of any such municipalities within said territory shall be permitted to operate anywhere within the limits of the larger territory so described.

"(h) The term 'regular route,' when used in this article, means that portion of the public highway over which a motor carrier usually or ordinarily operates or provides motor transportation service.

"(i) The term 'irregular route,' when used in this article, means that portion of the public highways over which a regular route has has not been established."

Section 5723, Revised Statutes of Missouri, 1939, provides:

"(d) A motor carrier not operating over a regular route may, within the territory permitted to be served by him, receive persons or property at a point located on a regular route and destined to a point not located on a regular route, and receive persons or property at a point not located on a regular route and destined to points on a regular route.

"(e) It shall be unlawful for any motor carrier, except one having a certificate of convenience and necessity authorizing such service, to accept persons or property for transportation from a point on a regular route destined to a point on a regular route or where through or joint service is being operated between such points, and any motor carrier so offending shall be guilty of a misdemeanor and punished as provided by section 5731. (R. S. 1929, Sec. 5267. Reenacted Laws 1931, p. 304; Reenacted Laws 1935, p. 321)."

Section 5724(a) provides, in part, as follows:

"It is hereby declared unlawful for any motor carrier to operate or furnish service as a common carrier within this state without first having obtained from the commission a certificate declaring that public convenience and necessity will be promoted by such operation. The commission upon the filing of a petition for a certificate of convenience and necessity shall within a reasonable time fix a time and place for hearing thereon. The commission shall cause a copy of such petition and notice of hearing thereon to be served . . . upon the officers or owners of every common carrier that is operating or has applied for a certificate of convenience and necessity to operate in a territory proposed to be served by the applicant . . . and any such common

carrier . . . is hereby declared to be an interested party to said proceeding and may offer testimony for or against the granting of such certificate, and any other person or persons who might in the opinion of the commission, be properly interested in or affected by the issuance of said certificate, be by the commission made a party, and may offer testimony for or against the granting of such certificate. If the commission shall find from the evidence that public convenience and necessity will be promoted by the creation of the service proposed, or any part thereof, as the commission shall determine, a certificate therefor shall be issued. In determining whether or not a certificate of convenience and necessity should be issued, the commission shall give reasonable consideration to the transportation service being furnished by any railroad, street railroad or motor carrier, and shall give due consideration to the likelihood of the proposed service being permanent and continuous throughout twelve months of the year, and the effect which such proposed transportation service may have upon other transportation service being rendered: *Provided, however,* no vested right shall accrue to any certificate of convenience and necessity; and *provided further,* that the issuance of a certificate of convenience and necessity to one carrier shall not prohibit the granting of such certificate to another carrier over the same route if in the opinion of the commission the public convenience and necessity will be promoted by so doing''.

Section 5721, Revised Statutes of Missouri, 1939, exempts ''taxicab, as herein defined'' from the provisions of Article 8 of Chapter 35, pertaining to the regulation by the Public Service Commission of transportation of persons by motor vehicles for hire.

Under its original certificate of public convenience and necessity the Yellow Cab Company was purportedly authorized to receive passengers from a point off of a regular route and to deliver them to a point on a regular route, or to receive passengers on a regular route and to deliver them to a point off of a regular route, as well as passengers to and from points off of regular routes. The company was not thereby authorized to receive passengers at a point on a regular route and deliver them to another point on a regular route. The service engaged in by the Yellow Cab Company was designated in its application as ''call and demand service''.

Notwithstanding the restrictions in its certificate the Yellow Cab Company, under pressure of existing demands did make hauls on Highway 71 from Camp Crowder to Neosho to Joplin, Webb City and Carthage, and to points south of Camp Crowder, and as far north as Butler, Missouri. However, the testimony of the applicant was that from fifty to sixty-five percent of the taxi business of this company was within the city limits of Neosho and from there to Camp Crowder and back. In order to obtain authority of the Commission thus to exceed the limitations of its existing certificate, the Yellow

Cab Company filed the amended application in question on July 16, 1942.

In said supplemental application the Yellow Cab Company set forth that there were then a very large number of soldiers located at Camp Crowder, which is close to Neosho, Missouri; that in fact a portion of said camp was in the suburban territory of Neosho; that since the applicant's original authorization, it has been receiving constant requests to haul passengers both from said camp and Neosho to many points in Missouri in the form of "call and demand service" between points on the routes of regular motor bus carriers, operating large equipment, which did not maintain "call and demand service", particularly in small groups of five passengers or less; that such demand has become so frequent and constant that the proposed service is reasonable necessary to public convenience. The extended service proposed was from Neosho and Camp Crowder to all points in Missouri, and return, "subject to the limitation that such service shall not be given between points on the route of a regular carrier maintaining like service, and by the term 'like service' is meant a 'call and demand service' ". The supplemental application contained proposed rates for such services, alleged to be much in excess of the rates charged by regular route motor carriers.

Upon the filing of said supplemental application by the Yellow Cab Company, the Commission gave notice to various state officials, attorneys and to "all intrastate passenger-carrying motor carriers", etc. of the place and date of the hearing of said application. On the date set for hearing, the respondent Crown Coach Company, a corporation of Joplin, Missouri, appeared and filed its Protest, referring to its own Certificate of Public Convenience and Necessity and Transit Permit No. 2; denied that appellant had jurisdiction to hear the application of the Yellow Cab Company; alleged that the protestant and other authorized carriers were ready, able, and willing to provide all such service as public demand and convenience demanded and required; denied the need for any additional service over which appellant had jurisdiction; alleged that the authority asked for was contrary to the orders of the office of Defense Transportation, General Order No. 20; that such orders would restrict such service to ten miles beyond the corporate limits of Neosho, and protestant asked that the application be denied and dismissed. This protest, filed before the taking of the testimony, was "taken with the case", and later overruled by appellant in its final order.

Upon the hearing and at the close of the applicant's testimony, the Crown Coach Company again filed its protest and motion to dismiss, similar to its motion filed before the taking of the testimony. This second motion was likewise "taken with the case", and later overruled by the appellant in its final order.

At the close of all the evidence, the protestant, respondent, filed a motion to dismiss on the ground that the application did not state facts sufficient to grant jurisdiction in the Commission; that under the facts stated, the proposed services were not included in article 8 of Chapter 35, Revised Statutes of Missouri, 1939; that the facts stated did not warrant the granting of a certificate. This motion was later overruled by appellant in its final order.

Such of the remaining facts as the evidence tended to prove and as we deem essential herein are as follows:

The major portion of the demand for the applicant's service was between Camp Crowder and Neosho; Camp Crowder and Joplin; Camp Crowder and Carthage; and Camp Crowder and Webb City; that the Crown Coach Company does not operate any "call and demand" taxicab service, nor does the Frisco Transportation Company. The Joplin Public Service Company operates busses from Joplin to Neosho and Camp Crowder, and the Shepherd Bus Lines operates busses from Springfield to Neosho. The proposed rates to and from Camp Crowder and Neosho, and within the camp of $1.00 per passenger; $1.20 for two passengers, $1.50 for three passengers, $1.60 for four passengers, $1.75 for five passengers, are all in excess of rates of regular carriers, wherein they duplicate; that the entrance to Camp Crowder it 1.3 miles from the city limits of Neosho, the bus fare for same is 15 cents; that there are between thirty and forty thousand soldiers now located at Camp Crowder; that many of them going on leave or furloughs find it impossible to leave the camp until certain hours and they do not have time to depend on busses to make train connections or bus connections in Neosho or Joplin, and they demand cab service at their barracks promptly upon their dismissal so that they can make their connections to town, or vice versa. If the bus service is available to them, they ride in busses into Neosho for the 15 cent charge, and if not available, they demand a taxicab and readily pay $1.00 for the service; that whatever restrictions the Office of Defense Transportation may impose on the proposed taxi service, the applicant intends to abide thereby; that applicant had received a telegram from that office to the effect that if a trip originates within the town or city limits, the trip will be limited to not more than ten miles beyond the corporate limits, but if the trip originates outside the corporate limits, a twenty-five mile trip will be permitted.

The applicant's evidence further tended to show, as an example, that on one occasion a young lady employed at the Post Exchange in Camp Crowder, called for taxi service to Camp Crowder on account of her ill health and inability to make the bus trip between Neosho and Camp Crowder, and oredered the taxi, paying the fare of $1.00. There was further evidence that the applicant had been in business since October, 1941, after the Government started construction of Camp Crowder, and that it had been in similar business theretofore in

Springfield, Missouri. Its witness stated that the entrance to Camp Crowder was 1.3 miles from the city limits of Neosho by a short route, and 2.7 miles by a longer route; that the major part of applicant's business was within two miles of Neosho; that there is much transportation of passengers between Joplin and Neosho and the camp by various certificated bus lines, and, also, by the railroads; that the Crown Coach Company is operating a great number of busses between Joplin and the camp, as is also the Frisco Transportation Company; that the applicant has some calls from Lanagan, Noel, Goodman, McElhaney, all within fifty miles of the camp constituting but a small part of its total business; that the outside calls are generally for Joplin, Webb City, and Carthage; that such calls are more frequent over the week-end for soldiers on leave or visiting; that on special emergencies, they take one passenger only; that by telephone, effort is made to organize group riding, but no connection agreement obtains with any other carrier.

The Police Judge of Neosho stated that he had lived there 27 years, and had been Police Judge 6 years; that in his observation there was need for additional taxicab service between that town and Camp Crowder; that the present bus lines and taxicab systems cannot accomodate the soldiers located at the camp; that he had seen the bus going out of Neosho loaded with soldiers hanging on and some standing in the aisles; that soldiers come to his office to call cabs to Joplin or Carthage, and sometimes would be able to get a cab and sometimes not; that about two-thirds of the soldiers are on passes one-half the time, and there are about 2000 civilians thereabouts and they need prompt service; that he had seen the Crown, Frisco and the Public Service busses present when hundreds of soldiers were standing around waiting for transportation to Joplin and Carthage; that there is no direct rail service between Neosho and Joplin except the Kansas City Southern, which trains run on certain schedules; the busses have more than they can do and are loaded at every trip out; that this condition did not exist prior to the time Camp Crowder was started; that he did not know whether the condition would be relieved as the soldiers were removed from Camp Crowder, but the condition would probably be better after such removal.

A witness employed at the construction office of the camp testified that the soldiers within the camp hitchhiked to the entrance of the camp and inquired for a train or bus to Joplin and oftentimes there would be no bus, or probably one had just left; that the busses do not run ever hour during the day and the soldiers want prompt transportation to their train connections at Joplin on railroads that do not run through Neosho; that such connections would sometimes give the boys two or three more days at home, or at least a day; that the Missouri Pacific runs through Joplin, but not Neosho; that the Frisco runs through Neosho enroute to St. Louis, but not Kansas City; that

the M. K. & T. runs into Joplin but not Neosho; that every fifteen or twenty minutes, two or three soldiers hire cabs to Joplin or some place close by; that there is constant and frequent demand for taxicab service to Carthage and Joplin.

An ambulance driver at the station's hospital at Camp Crowder testified that he is frequently called at his home to respond to emergencies and it is necessary for him to get from his home to the station on such calls, to drive the ambulance located there, and oftentimes the busses are loaded or do not arrive until the schedule time; that when on his regular shift he always rides the bus back and forth, the bus being cheaper; that he had heard soldiers complain that when the busses arrived, they were too crowded to board, and they would have to wait for the next one, which would likewise sometimes be filled to capacity.

Another witness, working at the station hospital at the camp, said there were about 125 nurses at the camp, who haven't any transportation except busses and taxicabs, and who did not like to ride the busses at night because they were loaded with soldiers, many of them drinking, and the nurses ride the taxis to avoid these conditions on the busses.

Mr. Walker, one of the partners of the applicant firm, further testified that it was their intention, if Camp Crowder were discontinued, to continue their taxi business thereafter, so long as there was need for service.

On behalf of the protestant, Claude Elliott of Neosho, testified that he has been in the taxicab business since 1936, operating under the authority of the Commission, covering three of four of the neighboring counties; that he operates a "call and demand service" in those counties using ten cars under that authority; that occasionally he has calls outside of these counties into other parts of the state, but not often probably two or three a month; those calls are to Springfield, Kansas City, and Nevada, but he does not service such calls; that he does give such service to Joplin, Carthage, and Webb City, except where the ODT limits it; that under the limitation of the ODT he operates one-half way to Joplin, making connections with other taxicabs from Joplin, such as 408 and the Yellow Cab Company of Joplin; that he limits his service to within ten miles of Neosho, having a working agreement with other cab companies in calls to Joplin; that week-ends the demands around Neosho and Camp Crowder are heavy, especially at night time; not so heavy in the day time; that he was able to take care of the demands coming to him for the service; that the major portion of his operation is outside of Neosho; that there is no bus company running a "call and demand" taxicab service either from or to Camp Crowder and Joplin, or any other point in the State of Missouri.

W. E. Batten of Neosho, testified in behalf of protestant that he was engaged in the business of driving cabs for the 32 Cab Company, authorized to serve four counties; that he did not serve long hauls; that since last April he had been driving taxicabs in the immediate community of Neosho and Comp Crowder; that generally he has full loads; most of the cars run to and from Camp Crowder; these calls are also made into Joplin, but not since the ODT order; that he also makes arrangements for interconnecting service with other companies at Joplin; that he does not have a certificate from the Public Service Commission of Missouri; that he works under Mr. Elliott, operating two cars for him of which the witness drives one; that he did not believe that the two cars operated by him, and the remaining ten operated by Mr. Elliott could serve the thirty or forty thousand soldiers and many civilians in Camp Crowder, but they could probably handle the long hauls; he knew they didn't have the authority to go to Springfield, Kansas City, or Jefferson City, nor outside of the four or five counties in his territory. The witness further testified that in order to avoid the ODT limitations, a load comes down and wants to go to Joplin, whereupon they call 408 or the Yellow Cab Company in Joplin and send a cab out to meet their cab at a specified place, and take the party on in; that this is seldom done by them for just one passenger, as he is requested to get a load before leaving; that if a passenger in Neosho wanted to go to Joplin, he would say to the customer, ''We will have to wait until we get someone else to go. We are not allowed to run empty under the new order''; that is they wait until there are four or five people making the trip.

The Report and Order of the appellant, as stated, overruled the aforesaid motions of the protestant, respondent herein. Among its principal findings were the following: that the applicant Yellow Cab Company of Neosho, Missouri, a partnership composed as aforesaid, is now engaged in the business of operating motor carriers for passengers with vehicles of carrying capacity of five passengers, over irregular routes from Camp Crowder, near Neosho, to all points in Missouri, and from all points in Missouri to Camp Crowder, near Neosho, subject to the limitation that the service shall not be rendered between two points on the route of a regular route carrier of passengers for hire, under their prior Certificate No. 324; that to grant the present application would extend the applicant's authority to render service between points on the route of the regular carrier where a like service, that is, ''call and demand'' taxicab service, was not being rendered; that the applicant had duly filed with the Commission its financial statement, insurance policies and other formal documents required; that Camp Crowder is located near Neosho and a portion of said camp is within two miles of Neosho; that the shortest route from Neosho to Camp Crowder is 1.3 miles; that the major portion, to-wit: fifty to sixty-five percent of the applicant's business

is between Neosho, its city limits, and Camp Crowder; that the balance of its business is within the surrounding communities and extending in every direction from Neosho; that between thirty and forty thousand soldiers and about two thousand civilians are located at Camp Crowder; that constant requests are received by the applicant to haul passengers from said Camp Crowder and Neosho to many points in the state in the form of "call and demand" taxicab service, and between many points on the routes of regular motor bus carriers' operating large equipment, and who do not maintain "call and demand" service, particularly the small groups of five or less; that the testimony showed that public convenience and necessity would be promoted by the proposed service; that the Police Judge of Neosho, for example, had testified to the crowded conditions of the busses in and out of Neosho, the great number of soldiers demanding transportation and cab service to Joplin or Carthage, and their inability at times to get any such service; that two-thirds of the soldiers are on passes one-half the time and, with the two thousand civilians, the demand is great for prompt transportation to and from Neosho and Joplin, or wherever they wish to go, and that although there were Crown and Frisco busses, several hundreds of soldiers are seen standing at times waiting for transportation to Joplin and Carthage; that there is no direct rail service between Neosho and Joplin except the Kansas City Southern, which trains run on certain schedules, and many passengers have to depend on the busses and taxicabs; that the bus lines are loaded every trip. The Commission found that the above testimony was substantiated by four other witnesses residing in Camp Crowder.

The finding of the Commission made reference to the incorporated record of the order previously granted the Joplin Service Company to operate intrastate as a passenger-carrying motor carrier over a regular route from Joplin to Neosho, and the army camp over U. S. Highway 71, and return, serving intermediate points; also, the previous order of the Commission granting William C. Faulkner authority to operate intrastate as a passenger-carrying motor carrier over a regular route from Carthage to Neosho, and the army camp over U. S. Highway 71, and several intermediate points, which latter order had been suspended upon the motion of William C. Faulkner, which motion was still pending. The Commission also made reference to the previous authority given to Crown Coach Company under its Certificate of Convenience and Necessity No. 2, granting that company authority to operate intrastate as a passenger-carrying motor carrier over a regular route from Kansas City to Joplin, to Lanagan, and on to the Missouri-Arkansas state line over U. S. Highway 71, and State Highway 88, from Lanagan to the said state line, and that many points and places are authorized to be served along said routes by said protestant.

The Commission further noted that Claud Elliott, doing business as 32 Cab Company, had been authorized by the Commission to operate intrastate as a passenger-carrying motor carrier with five passenger-carrying vehicles over irregular route to, from and between all points within the counties of Newton, McDonald, Jasper, Lawrence and Barry, except between two points on the route of a regular carrier, rendering like service, and by "like service" is meant "call and demand" taxicab service. The Commission reviewed Mr. Elliott's testimony as heretofore stated.

The Commission further took notice of General Orders No. 11 and 20 of the Office of Defense Transportation wherein, among other things, it is provided that taxicabs shall not be operated more than ten miles beyond the corporate limits of the municipality in which the trip originated, nor for any trip that exceeds twenty-five miles from the point of origin to the point of destination, and under the order, the Commission found that the applicant comes under the definition of "taxicab" as defined in said order of the Office of Defense Transportation.

In passing on the contention of the protestant that the proposed operations of the applicant are not within the jurisdiction of the Commission because the major portion of its business is within Neosho and its suburban territory, and for that reason is in the "taxicab" business and exempt from the motor carrier act, the Commission adopted and quoted at length its holdings on that question in granting the original application of the present applicant for its present Certificate of Public Convenience and Necessity, wherein it held that while Camp Crowder (at least the present entrance thereof) is within the suburban territory of Neosho, and that if that application did contemplate service solely between Neosho and Camp Crowder, it would have properly held that it had no authority in the matter, under the provisions of Section 5720, paragraph (a), but inasmuch as applicant at that time sought authority to provide service from Neosho to all points in Missouri in a "call and demand" service, subject to the restrictions prohibiting service between two points on the route of a regular route bus operator, that this restriction voluntarily assumed by the applicants, together with their proposed service, classified them under paragraph (b) of said Section 5720, instead of paragraph (d) thereof, and such operations became state-wide in scope, limited only to the provision that they were not to serve between points of a regular route of a motor bus operator for hire; that when a motor carrier extends its operations beyond the municipality and its suburban territory, it becomes subject to the regulations of the Commission.

The Commission's Report and Order made plain its desire to cooperate with the Office of Defense Transportation in whatever limitations the orders of said office might impose upon the proposed author-

ity, but held that under 'the application and the showing of public convenience and necessity, the Commission had no discretion but to grant the authority requested, stating that the orders of the Office of Defense Transportation would, nevertheless, take precedence in so far as there might be a conflict, and stated that for the duration of the war every holder of a grant of authority from the Commission must conform to the orders of the Office of Defense Transportation and other agencies of the United States Government having jurisdiction.

The Commission found that the present demand and need for transportation existed and remained as it was when the applicant's prior certificate was granted, and had this additional authority been asked for in the original application, the Commission would have been inclined to grant the same. The Commission made a formal finding under the evidence that the authority prayed for will result in the promotion of public convenience and necessity and should be granted, subject to the orders of the Office of Defense Transportation of the United States of America. Whereupon, the application was granted by appellant, purporting to give the applicant additional authority to operate intrastate as a passnger-carrying motor carrier with five-passenger-carrying vehicles over an irregular route from Camp Crowder and Neosho, Missouri to all points in Missouri, and from all points in Missouri to Camp Crowder and Neosho, Missouri, subject to the limitation that the service be not rendered between two points on the route of a regular route carrier rendering a like service, and that by the term "like service" is meant a "call and demand" taxicab service, and provided that such authority shall be exercised pursuant to the orders of the Office of Defense Transportation of the United States of America, said service to be rendered by the use of the motor vehicles described in the application and evidence, and with such other five-passenger motor vehicles as may be subsequently licensed and approved by the Commission.

Following the Commission's Order and Report aforesaid, respondent filed its motion for rehearing on the grounds that said Order and Report was unlawful and unreasonable for the reasons, to-wit: the application did not contain sufficient facts to show the jurisdiction nor public convenience and necessity; that the proof was insufficient to show the jurisdiction and public convenience and necessity; that the Commission erred in overruling defendant's motions to dismiss; that the Commission erred in receiving incompetent evidence and rejecting competent evidence over respondent's objections; that the proof showed the applicant to be merely a taxicab operator seeking to furnish the same service as theretofore furnished by it under prior certificate, and that the Commission had no jurisdiction to grant the authority for such operation; that the Commission acted contrary to law when predicating its order on the statement that when a taxicab operator extends his operations beyond the municipality and its

suburban territory, he becomes subject to the regulation of the Commission; that even if the Commission did have jurisdiction, the Commission erred in granting an irregular route authority over the routes of regular route carriers; that the operations of the applicant and the character of his equipment were such that under Seciton 5720, Revised Statutes of Missouri, 1939, the Commission was without jurisdiction to grant the certificate in question, and that the granting of same was unlawful and unreasonable; that even with jurisdiction in the Commission, the application was based on speculation and conjecture as to the permanency of the conditions (Section 5724, R. S. Mo. 1939); that the Order and Report was against the weight of the evidence and against the law, and the certificate granted could not be operated under Order No. 20 of the Office of Defense Transportation, which would render such operation unlawful.

The respondent's motion for rehearing being overruled by the Commission, the cause, on petition of the respondent for *certiorari,* was certified to the Circuit Court of Cole County, Missouri, for review, where, upon hearing, said Order and Report of the Commission was reversed and the cause was ordered remanded to the Commission for further action. Appellant thereupon appealed to this Court.

The questions of law raised by the parties on appeal, condensed and classified, may be stated as follows:

1. Was respondent an ''interested'' party, and therefore a proper party herein?

2. Under the proof, was the applicant exempted from the jurisdiction of the Commission as a mere operator of ''taxicabs''?

3. If so exempted by law, did applicant waive such exemption by its applications and thereby vest the jurisdiction?

4. Did the Commission have jurisdiction over applicant, even if otherwise exempted, because of and to the extent of the applicant's operations beyond the municipality and its suburban territory?

5. Did the Commission have power to grant a certificate authorizing intrastate operations by applicant over an irregular route involving or including any part of a regular route for which respondent held prior certificate of convenience and necessity?

6. Do the rules of the Office of Defense Transportation render the Commission's order void?

Appellant contends that under the evidence respondent was not affected by the order of the Commission and hence was not a proper party below or in this appeal. No objection was made below as to the right of respondent to appear as protestant or to institute the *certiorari* proceedings. On this appeal appellant argues that the following order of the Commission did not affect the interest of the respondent, nor can respondent be an ''aggrieved'' party as required for right of review or appeal, and for that reason has no right to oppose appellant in this appeal:

"The service proposed is from Neosho and Camp Crowder to all points in the State of Missouri and return; subject to the limitation that such service shall not be given between points on the route of a regular carrier maintaining a like service, and by the term 'like service' is meant a call and demand taxicab service".

Under Section 5693, provisions are made for appeal from the judgment of the Circuit Court in proceedings of this kind, and it is provided that:

"The commission, any corporation, public utility' or person or any complainant may after the entry of judgment in the Circuit Court in any action in review, prosecute an appeal to a court having appellate jurisdiction in this state. Such appeal shall be prosecuted as appeals from judgment of the circuit court and civil cases except as otherwise provided in this article. . . . The general laws relating to appeals to the supreme court and the various courts of appeals in this state shall, so far as applicable and not in conflict with the provisions of this chapter, apply to appeals taken under the provisions of this chapter".

Whether or not the same law applies to respondent in this appeal as applies to the appellant, as to their respective rights to be parties therein, which we do not decide, it seems clear to us that when provision is made for operators of five-passenger cars to pick up passengers along or to haul them over any part of the regular route of an authorized bus carrier on a "call and demand" service, that to that extent the regular carrier is affected. It is affected not only pecuniarily, but may be affected as to schedule, size, and capacity of its busses, number of operators, etc., to meet the additional and consequent competition.

A protesting party need not even be pecuniarily affected. He need have only such an interest required to be "a complainant upon whose complaint a case is commenced". In the very recent case of State ex rel. Consumers Public Service Company et al. v. Public Service Commission et al., 180 S. W. (2d) 40, 46, the Supreme Court has so construed the Public Service Commission Act in that respect, holding that the reference to the general code respecting appeals pertains to procedure where otherwise not specifid in the act; that there is nothing in said provision limiting the rights of such an interested party, to exclude right of appeal; that such party need not necessarily have a pecuniary interest or property rights involved, which will be directly or immediately affected by the order, but only such interest as would be required for a complaint to be heard by the Commission, and that any local interest in the situation, such as a customer, representative of the public in the locality or territory affected, or a competitor for the same territory or privilege, are sufficient bases for intervention, protest and appeal.

Under the evidence in the instant case and under the statutes and the decisions of the courts, we conclude that the respondent was and is an "interested" party in these proceedings and hence a proper party below and in this appeal.

The appellant contends further that if the present operations of the applicant in fact constitute the applicant as a mere operator of "taxicabs" under the statutory definition, the exemption as afforded by that statute as to such taxicab operations from regulation thereof by the Public Service Commission has been waived by the applicant by its former application and by its supplemental application now in question, voluntarily subjecting the applicant to the jurisdiction of the Commission. The respondent maintains that the applicant was and is merely an operator of taxicabs; that the Commission had no jurisdiction over the applicant when properly confined to its legal operations as taxicab operator; that the supplemental application contemplates mere continuance of the same character of its business as taxicab operator, and the jurisdiction over such exempted operations cannot be vested in the Commission by the mere filing of the application by the applicant. Respondent, however, at the same time contends that as to any operations by the applicant in excess of its lawful authority as operator of taxicabs, the Commission would have jurisdiction over such operator as to such unauthorized operations.

The exemption of "taxicabs" from the regulation and jurisdiction of the Public Service Commission under Section 5721 has other purposes than those personal to the operators of that type of service. No doubt one main purpose was to allow for the local regulation of such carriers by the municipality involved. The exemption constitutes subject-matter expressly withheld from the jurisdiction of the Commission which cannot, by the act of the operator, or in fact, by the act of the Commission, be brought within the jurisdiction of the Commission in contravention of the statute. This Court said in State ex rel. Pitcairn v. Pubic Service Commission, 232 Mo. App. 755, 111 S. W. (2d) l. c. 984:

"A Public Service Commission, it is true, being unknown at common law, derives its authority wholly from constitutional or statutory provisions. It possesses only such powers as are thereby conferred, either expressly or by necessity or fair implication, and such incidental powers as may be requisite to carry out thoase granted".

We hold that neither the filing of the former nor the pending application by the Yellow Cab Company, nor the Commission's attempted exercise of jurisdiction as to same, can supply jurisdiction over the subject-matter thereof if otherwise such jurisdiction is lacking.

It is evident that under Section 5720(d) Revised Statutes Missouri 1939, motor vehicles of the type therein described and used for hire as common carriers are either "taxicabs" or they are not "taxicabs",

depending on the location of their principal operations. Under the evidence in this case the motor vehicles in question were common carriers for hire. [See State ex rel. Anderson, 340 Mo. 1004, 102 S. W. (2d) 99.] To determine the jurisdiction, if any, of the Public Service Commission over such vehicles of the type described, when used for hire as common carriers, as in the instant case, the statutory test is whether the "principal operations" of the same are "confined to the area within the corporate limits of cities of the state and suburban territory as herein defined". If the facts show all the elements of such exemption to exist, then no part of Article 8, Chapter 35, Revised Statutes Missouri 1939, applies to such carriers and the Public Service Commission has no power or jurisdiction over them. If the facts show any element of exemption lacking, then such vehicles are within the purview of Section 5720(b) and 5725, which statutes and all other applicable provisions of said article affect such vehicles, and the jurisdiction of the Public Service Commission would obtain.

Respondent, denying the jurisdiction of the Commission herein to entertain the application under consideration, but at the same time urging that the Commission has jurisdiction to regulate "taxicabs" in their operations outside of their restricted area, argues that the words "principal operations of which are confined", etc., mean "one" of the "principal operations", or a part of the "operations", and not the "sole" or "main" operation; that such a business may have "several principal operations." It seeks to ascribe to the word "principal" the meaning of "important", as distinguished from "minor" or "unimportant". It claims that if 50 to 65 percent of the applicant's operations are within Neosho and suburban territory thereof, that the remaining operations, outside of said city and suburban territory, are also "principal operations". Whether or not this is contradictory to the stand taken by the respondent here and below, and amounts to a confession by respondent of the point of jurisdiction, as so declared earnestly by appellant in its reply brief, we are compelled to evolve and declare our own construction of the meaning of the statutory words in question.

We believe that the words of the statute "the principal operations of which are confined", etc., mean such part of all such transportation service of the vehicle described, as shall constitute the greater volume of such transportation service furnished. Any other construction would defeat the very purpose of the Legislature to fix and to characterize such taxi service as primarily local.

On the subject of the location of the principal operations of the applicant at present, its witness Walker testified:

"Q. Now on your taxi business is the major part of your taxi business in the city limits of Neosho and out to Camp Crowder and back?

"A. Yes, sir, the major part, especially at this time.

"Q. What percentage of your business would you say is around Camp Crowder and Neosho and between those two places?

"A. Oh, between 50 and 65 percent.

"Q. And the balance of your operation consists of what?

"A. At the present time between Joplin and Neosho, and Carthage and Neosho, and Camp Crowder and Webb City.

"Q. Now what type of automobiles have you been operating all the time since you started this operation?

"A. 5-passenger sedans.

"Q. And is that all of the cars that you have, or have ever had in this operation?

"A. Yes, sir.

"Q. And that is all you employ in this operation is 5-passenger automobiles?

"A. Yes, sir.

"Q. And that is to haul not to exceed 5 passengers, exclusive of the driver?

"A. That is right.

"Q. And the major part of your business is now, with the emergency in Neosho, within two miles of Neosho, that is correct, isn't it?

"A. Well, the largest percentage of the busines is, yes, sir.

"Q. That means the larger part, the greatest percent, is that right?

"A. That is right.

"Q. You stated in your direct examination that the major portion of your business was that portion carried on between the camp and Neosho, is that correct?

"A. The major part, yes, sir.

"Q. 50 to 65 per cent?

"A. Something like that.

"Q. Where do you do the rest of the business, between what points?

"A. Well, I have made the statement between the surrounding communities, each and every direction from Neosho".

There was no evidence contradicting the above testimony as to the applicant's principal operations. It is clear that such evidence placed the applicant's principal operations within the confines of Neosho and its suburban territory. Such fact, together with the other elements of its business in evidence, brings applicant, at least at the time of the hearing, within Section 5720(d) defining "taxicabs" which, under Section 5721, are exempt from the regulation and jurisdiction of the Public Service Commission.

But the further question arises: as of what date does the status of the applicant's motor vehicles as "taxicabs" or not "taxicabs"

apply in determining the question of exemption or jurisdiction? Is it its former or present status, or the status it would assume under the service proposed?

The service proposed in this case is as follows:

". . . to operate intrastate as a passenger-carrying motor carrier with five-passenger carrying vehicles over an irregular route as follows:

"From Camp Crowder and Neosho, Missouri, to all points in Missouri and from all points in Missouri to Camp Crowder and Neosho, Missouri, subject to the limitation that service be not rendered between two points on the rate of a regular route carrier rendering like service. By the term 'like service' is meant a 'call-and-demand' taxicab service. It is understood that the authority herein granted applicant shall be exercised pursuant to the orders of the Office of Defense Transportation of the United States of America."

We conclude that it is the service proposed that should be considered in determining the status of the motor carrier under the statutory definition of "taxicab", and in determining the question of jurisdiction of the Commission over the same.

Let us see if the application and proof in this case establish the fact that the proposed service will take the applicant out of its present exempted class as an operator of "taxicabs" and establish jurisdiction in the Commission. It is true that the applicant in its present application seeks authority as an irregular route carrier to operate the same type of motor vehicles from Camp Crowder and Neosho to all points in Missouri and return, even over regular routes, including service with origin and destination thereon, except only between points on a regular route of a regular carrier rendering "call and demand" service.

There is nothing in the application to the effect that, if the same be granted, the "principal operations" will not continue to be confined to the corporate limits of Neosho and its suburban territory.

Does the proof furnish this element, which is vital to the jurisdiction of the Commission? After fixing the location of the principal operations of the applicant at present to be in Neosho and suburban territory thereof, as heretofore quoted, the witness for the applicant was asked to state the location of the demand for the proposed service, and the witness, Mr. Walker, testified as follows:

"Q. Since you are and were authorized in March, 1942, have you been operating taxicab service serving Neosho and Camp Crowder?

"A. We have.

"Q. Where is the major portion of the demand for your service, between what points?

"A. Between Camp Crowder and Neosho, Camp Crowder and Joplin, Camp Crowder and Carthage, and Camp Crowder and Webb City, that is the major portion of it.

"Q. At the present time you are authorized, for instance, to operate from Camp Crowder to Jefferson City, if a group of soldiers want to use your service?

"A. Yes, sir.

"Q. Have you been hauling passengers from Camp Crowder to Neosho and Joplin?

"A. We have.

"Q. What percentage of your business would you say is around Camp Crowder and Neosho and between those two places?

"A. Oh, between 50 and 65 percent.

"Q. And the balance of your operation consists of what?

"A. At the present time between Joplin and Neosho, and Carthage and Neosho, and Camp Crowder and Webb City.

"Q. Now ever since your certificate was granted you have been hauling, if anybody wanted to go, from Neosho or Camp Crowder into Joplin, isn't that true?

"A. Yes, sir.

"Q. And you have been hauling over 71 Highway, haven't you?

"A. Yes, sir.

"Q. And during the time you have been hauling have you ever made a trip to Kansas City?

"A. No, sir.

"Q. What is the farthest north you have been called upon to make a trip?

"A. Butler, Missouri, I believe.

"Q. And Butler is only about 70 miles south of Kansas City?

"A. I wouldn't know the exact distance.

"Q. And you made that trip to Butler over 71 Highway, did you not?

"A. Yes, sir.

"Q. Now you don't have many calls south of the camp do you?

"A. We have some calls from Lanagan, Noel, Goodman, and McElhaney.

"Q. And that is all within a few miles, or comparatively short distance from the camp?

"A. Within fifty miles.

"Q. Well, Lanagan isn't fifty miles from the camp?

"A. That is Noel and Lanagan.

"Q. But those calls are very infrequent, aren't they, Mr. Welker?

"A. Well, they wouldn't run up in the hundreds.

"Q. I say, it is a very small part of your total business?

"A. A small part of the total business, yes, sir.

"Q. And the main part of all of your outside calls is for Joplin, is that correct?

"A. Joplin, Webb City and Carthage".

He testified that when he is called to make a trip to Joplin, he goes to Joplin and back; that it is 22 miles from the camp to Joplin. He stated that they have several calls to Webb City and over the weekend most of his calls are for soldiers going into Joplin, Carthage, and Webb City on leave, visiting these points.

On re-direct examination, Mr. Walker testified:

"Q. In the event the Commission should hold that they have no jurisdiction over your operation because of the fact the major portion is in Neosho and its surrounding area, would you then continue to operate occasionally up to Webb City, Joplin, Springfield, Carthage, if the Commission has no jurisdiction and you can operate without paying those fees?

"A. If we can operate without the jurisdiction, why, sure, we will operate.

"Q. Do you propose to continue to operate in the event the Commission holds it has no jurisdiction over your operation?

"A. Yes, sir."

The applicant's own evidence above quoted shows that the applicant is already furnishing the proposed service where the greater demand therefor exists, to-wit: between Camp Crowder and Neosho; Camp Crowder and Joplin; Camp Crowder and Carthage; and Camp Crowder and Webb City, and, in addition, is carrying such service to points south of Camp Crowder and elsewhere, and *still* the principal operations of its taxicabs are within Neosho and its suburban territory. There is no showing that the service proposed will alter the present location of the principal operations of the taxicabs from Neosho and suburban territory thereof, nor that the applicant will thereby emerge from the exempted class of carriers. In fact, the applicant's evidence is to the contrary, as stated. Under such conditions the Commission had no jurisdiction of the subject-matter. This situation is not avoided by calling the applicant's proposed service "call and demand" or any other designation not recognized by the statute. Under the statute "taxicabs" remain "taxicabs" whatever else they may be called.

Concluding, as we do, that the Commission, under the law and evidence in this case, was without jurisdiction to grant the application in question, the result is that the order made was and is invalid. It is therefore not necessary to consider the further points involved in this appeal. It follows that the judgment of the Circuit Court of Cole County, Missouri, should be and is hereby affirmed. All concur.