STATE of Missouri, on the relation of SMITHCO TRANSPORT COMPANY, a corporation, Appellant,

v.

PUBLIC SERVICE COMMISSION of the State of Missouri and Tyre W. Burton, E. L. McClintock, Charles L. Henson, M. J. McQueen, and D. D. McDonald, as members of said Public Service Commission, Respondents.

No. 22578.

Kansas City Court of Appeals.

Missouri.

Oct. 1, 1957.

Motion for Rehearing Denied and Motion to Transfer to Supreme Court Sustained Dec. 2, 1957.

Kyle D. Williams, Neale, Newman, Bradshaw, Freeman & Neale, F. B. Freeman, Jean Paul Bradshaw, Donald J. Hoy, Springfield, for appellant.

Glenn D. Evans, Gen. Counsel, Frank J. Iuen, Ass't Gen. Counsel, Jefferson City, for respondent.

Hendren and Andrae, Jefferson City, for Dairyland Transportation Corporation.

HUNTER, Judge.

This is an appeal from an order of the Circuit Court of Cole County affirming an order of the Respondent Public Service Commission, which order denied an application filed by Appellant, Smithco Transport Company, for a certificate of convenience and necessity for authority to operate *intrastate* as a freight-carrying common carrier in the transportation of fluid milk and other dairy products in vehicles used exclusively for this purpose over irregular routes in Missouri between certain points named in the application.

Smithco Transport Company previously had applied for and had been granted an *interstate* permit from respondent. It now seeks authority to transport milk and other dairy products in tank vehicles and bulk vehicles over irregular routes in Missouri between Springfield, Marshfield, Lebanon, Ozark, Mountain Grove, Hartville, Mansfield, Ava, Cabool, Willow Springs, Houston, Alton, Salem, Aurora, Monett, Mount Vernon, Bolivar, Buffalo, Eldon, Warsaw, Versailles, Eldorado Springs and Kansas City; and from these points on the one hand to St. Louis, Jefferson City, Columbia, Sedalia, Rolla, Joplin, Neosho, West Plains, Poplar Bluff and Cape Girardeau on the other hand. It asks authorization of this service irrespective of the location of the points on the route of regular route common carriers, or on the route of two or more common carriers, between which joint or through rates have been established. Applicant proposes in its application that the rates to be charged for the service rendered shall be fair and reasonable and such as the Commission may prescribe or authorize.

We feel that some preliminary and brief explanation of the factual situation of the interested parties and of the questions involved in this case would be helpful before turning to the detailed testimony given before the Public Service Commission.

In 1937, Congress enacted the Agricultural Marketing Agreement Act [1] which authorized the Secretary of Agriculture to regulate the "marketing conditions" affecting the movement and sale of certain farm products including milk in federal marketing areas to be established by the Secretary.[2] Pursuant thereto the Secre-

---

1. 50 Stat. at L. 246, Chap. 296, 7 U.S.C.A. § 601ff.

2. For a summary of the history of the Act commencing May 12, 1933, see 59

tary of Agriculture issued Order No. 3, in evidence herein, which established the St. Louis, Missouri, marketing area, composed of St. Louis City, St. Louis County and certain contiguous area in Illinois. Sanitary Milk Producers, a farmer co-operative, collects milk from its Missouri members and ships in intrastate commerce by means of common carrier service, this fluid milk in bulk primarily from its plant at Lebanon, Missouri, and possibly from its plant at Mountain Grove, Missouri, to processors in St. Louis, Missouri, in the Federal Market ing Area. Sanitary has varying but incidental amounts of surplus milk at its Lebanon, Missouri, plant which it processes into butter and cheese, and likewise ships to places in the St. Louis Marketing Area. It is these shipments of fluid milk primarily from its plant at Lebanon, Missouri, to the Federal Marketing Area that are involved [3] in the principal question raised here; namely, whether or not under the circumstances of this case the Missouri Public Service Commission has jurisdiction to require a transport carrier employed by Sanitary to first secure a certificate of convenience and necessity and subject itself to rate regulation in order to transport this bulk fluid milk from its Missouri plant at Lebanon to its destination in Missouri within the mentioned Federal Marketing Area.

Appellant's first contention is that it does not because the Federal Government has so pre-empted the field through the Agricultural Marketing Agreement Act as to preclude the Public Service Commission from any jurisdiction to require a certificate of convenience and necessity, and to regulate the hauling rates. Protestant, Dairyland Transportation Corporation, contends that while Congress could have pre-empted

the field to that extent it has not done so. Appellant makes a second contention that by statutory provision the State of Missouri itself has exempted carriers from Public Service Commission regulation while making these hauls of bulk fluid milk. Section 390.030, subsection (4), RSMo 1949, V.A. M.S. Appellant's third and final contention is that the order of the Commission refusing the certificate was in violation of Missouri's public policy of regulated competition.

During the hearing before the Public Service Commission there was evidence adduced in support of the application for the certificate of convenience and necessity to the following effect: Sanitary Milk Producers, referred to herein as Sanitary, is a large co-operative association composed of five thousand dairy farmers, who reside in twenty-five counties in Illinois and some sixty-eight counties in Missouri. This association was organized twenty-five years ago. At that time the bulk of its milk came from twenty-five Illinois counties and only eight Missouri counties. However, Missouri has become one of the leading dairy states, and is continuing to show growth in that capacity. Sanitary has operated in St. Louis since 1937 under a federal order program which presently is embodied in Order No. 3. Its intent and effect is to equalize prices among handlers for milk in liquid quantities, and it establishes the prices as well as the location of the zone differentials which reflect the cost of hauling from a given point to the city. Sanitary has a plant in Lebanon which is in the 27-cent zone, and one at Mountain Grove which is in the 29-cent zone. Under the order it is permitted to deduct that amount per hundred weight from the price paid to the producer. Sanitary supplies about seventy-five per cent of all the milk used in the St.

Harvard Law Review, page 685ff. For cases explaining in some detail the provisions of the Act, see United States v. Rock Royal Co-operative, Inc., 307 U.S. 533, 59 S.Ct. 993, 83 L.Ed. 1446; H. P. Hood & Sons v. United States, 307 U.S. 588, 59 S.Ct. 1019, 83 L.Ed. 1478. See

also, Stark v. Wickard, 321 U.S. 288, 64 S.Ct. 559, 88 L.Ed. 733.

3. In appellant's Reply Brief it says, page 3: "* * * as a practical matter, this case was heard on the need for common carrier service from Lebanon to the St. Louis Marketing Area."

Louis market and 100 per cent of all the milk used in Jefferson City. It has other outlets in Missouri. Its business in the past year was in excess of 500 million pounds of milk and over $20,000,000 in revenue. Some time in the future it plans to expand its business to include Columbia, Rolla, Joplin, Neosho, West Plains, Poplar Bluff, and Cape Girardeau. Its principal occupation is to sell whole milk in fluid form to the processors or distributors in the city and surrounding territory for ultimate distribution in bottles to the customers. The milk is purchased from the farmers in the (southwest Missouri) area and is collected primarily at the Association's plant at Lebanon, Missouri, and to some small extent at its plant at Mountain Grove, Missouri. As expressed by one witness, " * * the cows give the milk, you have to accept it"; thus, necessitating an operation 365 days of the year. When there is an excess of fluid milk as is frequently the case because the supply and demand varies from day to day, that excess is manufactured into some milk product such as cottage cheese, other types of cheese, powdered milk and butter. The heaviest volume at the plants of Sanitary is on week ends and holidays. Because of the type of product it must be handled and processed rather quickly to avoid spoilage. Its storage facilities are limited. It doesn't have warehouse facilities. It is primarily interested in transportation from Lebanon, and possibly Mountain Grove, where expansion is being considered, to the points within Missouri named in its application, and from those points to Lebanon and possibly Mountain Grove.

The only plant at which Sanitary manufactures cheese, butter and condensed products is located at Lebanon. As to its hauling problem concerning its non-fluid dairy products its manager's testimony was: "Q. How many private trucks does your company (Sanitary) have at Lebanon to haul butter and cheese? A. One truck that is properly refrigerated.

"Q. And that one truck is sufficient to handle the overflow that you have at this time. A. That we haul.

"Q. Taking away from what the common carrier has been able to haul for you during the week, it leaves you with only an excess which can be handled by one truck of your own on week ends? A. By working around the clock and winding up with every facility loaded to the hilt on Monday we have been able to do it.

"Q. It is a full truckload on week ends? A. Yes, sir, and it makes more than one trip." He further indicated that common carrier service is not available on Saturdays, Sundays, or holidays.

Sanitary has expansion plans which its manager says will change its picture entirely and will increase its need for transportation service. However, it was not willing to disclose those plans in any detail at the hearing. These plans for expansion may call for plants in other places and especially for enlargement of facilities at Mountain Grove.

The type of hauling service it believes necessary and desires, particularly for its fluid milk is indicated somewhat by the following testimony of its manager: "We must have ample equipment available at our plant to be on call at a moment's notice. This morning we may call a plant and tell them to send us seven tanks of milk. At noon we may call them and tell them to cut off two of those tanks or we will at noon (call) and tell them to add one tank."

Sanitary's manager further testified that he did not know of any carrier other than Dairyland Transport Company, one of the protestants, who had authority to handle dairy products in tank vehicles between the points involved, but did know there were other common carriers who handled dairy products in trucks.

Sanitary's plant at Lebanon is unionized. Sanitary had experienced some difficulty in

getting its milk moved as a result of strikes incurred by its previous hauler. In an effort to avoid any hauling delay or stoppage it endeavored to secure the services of another carrier. As explained by its manager " * * * we consulted with them (its union) as to carriers who had the equipment who would be suitable to the union whose drivers were properly qualified to permit the loading from our plants. And there were no local carriers who the union would permit, so we were forced to go to Illinois to find a carrier with the equipment that would meet all the requirements and with drivers who the union would permit to load from our plant and to unload in the city." Then in April 1955, Applicant, Smithco Transport Company, a newly organized Missouri corporation for this purpose, commenced the hauling of Sanitary's fluid milk under a lease arrangement whereby it provides the equipment Sanitary needs and charges so much per hundred weight for transporting the milk. As stated, Smithco had applied for and had been granted an interstate permit and now wanted an intrastate permit.

In speaking of Smithco's transportation service, Sanitary's general manager said: "His vehicles are located, they are housed, they are based in the vicinity of our plant. The drivers live there. Those plants, as the milk is received early in the morning from the producers, when the milk is received it is weighed, tested, and then as soon as one of the tanks is filled, the driver gets in the cab he is told the exact time and the hour, not approximately, but the exact minute that he must arrive at his destination. That is done. In our business, we cannot operate by calling him and asking him to send a tank over. Milk must be pasteurized within 24 hours from the time it is produced on the farm. So we just don't operate a fluid milk business by calling somebody and hoping they have a tank, or wait until they can send us one from some other point." He also testified that Smithco satisfactorily provided the service requested of it by Sanitary Dairies.

Additional testimony by Sanitary's manager was to the following effect: "The only way to properly move Sanitary's milk would be to get a certificate issued whereby somebody can come in and do it and be there at its bid and call", and that he does not know of anybody else, other than Smithco, from whom it could get the equipment that would park it at the plant and leave it there to go at a moment's notice.

In February 1953, when they (Sanitary) were looking for someone who could fill their needs they discussed it with a lot of people, including protestant, Dairyland Transportation Corporation. This transportation company is the holder of a certificate of convenience and necessity for the handling of fluid milk and dairy products intrastate, and is the hauler used by M. F. A. It has tank trucks of the same type as applicant's for use in hauling fluid milk. Sanitary's manager testified: "None of them, in our opinion, could do the job or fill the need as would be required to take care of our operation.

"Q. Did you offer them any milk to haul? A. No, sir.

"Q. You never offered them any? A. No, sir.

"Q. In other words, what you did was to make an inquiry from them and then you determined you didn't think their service would be satisfactory and you didn't offer them any milk? A. That is right no direct offer.

"Q. Did you ever tell anybody connected with Dairyland that under no circumstances would you allow Dairyland to haul for you? Particularly, did you write a letter to that effect? A. I believe I did. Yes, sir.

"Q. All right. Would you mind telling me why you wrote such a letter? A. No, sir. I would be happy to do that. We attempted to negotiate with Dairyland Transport Company and described in detail the nature of our operation, and the arrangement under which we felt we would have to operate. The service that they had avail-

able was not in accordance with our requirements but it was on their own terms and provisions. In addition to that, that was not the sole determining factor, we knew of the union problem, which we realized we could do nothing about. They did not meet those requirements * * *." At another point during the hearing the following testimony of Sanitary's manager further indicated his reason for his feeling that Dairyland could not provide for Sanitary's hauling needs. "Q. You tendered no shipments to them at any time? A. Approximate volumes that we anticipated, they submitted their proposal on the basis that they could haul, which did not fit our requirements, and we were very sure that they could not do the job.

"Q. As a result of that you have never tendered them anything, is that correct? A. We have not.

"Mr. Freeman: What are the facts as you know them? The Commission is interested in the facts that led you to believe that Dairyland cannot supply your needs, that is, so that there is a need for this other certificate. A. First of all, the very nature of our operation, all trucks and equipment, and they cannot be of one size tanks, they must be of varying sizes.

"Q. Do you mean when they told you what they would furnish you that they told you they would furnish one size tank? A. Frankly, I don't recall the exact words, whether it was all one particular size tank or not; that has been quite sometime ago.

"Q. As to the tanks they said they could furnish you and supply you, would those tanks fill your needs? A. No. The number of tanks, the type of tanks, the availability, I mean being housed there so they can be used on a moment's notice, the minimum load requirement, the hauling rates, the union factors, those must be taken into consideration."

"Q. Were they able to promise you to house their tanks there even though they were not the exact size you wanted, and to house them in St. Louis as and when you needed them? A. The housing, as I recall it, was in Springfield rather than St. Louis.

"Q. Were they able to promise you that they would furnish those tanks and house them as your operation required? A. Not on a basis that we could pay.

"Q. All right. Now, then, on the basis you can pay, as to that proposition, what did they say to you that they would charge you as far as the expense on it. A. I don't recall the exact rates at the moment. The rates were substantially higher than we could obtain hauling.

"Q. Would you tell the Commission they were prohibitive in making your operation a successful one? A. They were prohibitive.

"Q. You couldn't pay them? A. We couldn't pay the rates."

The manager also testified as to his belief that Dairyland may have given preferential treatment to a competitor of Sanitary's. Further, Sanitary must have a loyalty that is unquestioned and Dairyland had a contract for exclusive hauling of all fluid milk produced by M. F. A., one of its main competitors.

Sanitary's manager was asked: "Q. Is that one of the conditions of your negotiations with this common carrier, Dairyland Transport, that they have equipment placed on your premises that it could be used at a moment's notice? A. Yes, sir.

"Q. And that is what you require of this applicant here? A. Yes, sir.

"Q. And you will require him to be unionized, is that correct? A. Yes, sir. We have no choice in it. * * *

"Q. Mr. Spaulding, why would you require that they be unionized * * *?

A. Our plant is unionized, it is a closed shop. Employees in our plant will not load

tanks that the drivers are not only unionized, have the card, but have to be approved by their business agent.

"Q. Let me ask you this in that connection, whether or not they are required to have a union contract also, the employer of the drivers? A. That is right, he must have. * * *

"Q. But did you at that time consult with the business agent of the union having jurisdiction of the inside employees of the Lebanon plant, and were you advised of what line would be loaded and what would not? A. That is right.

"Q. And was this one of the lines you were advised that would not be loaded, and not to bring their trucks in there? A. That is right."

As to applicant Smithco, it was stipulated that its equipment was satisfactory for the desired service of Sanitary. It was ready and willing to perform the service for which the certificate was requested. As to its union situation its president testified:

"Q. I believe the question is, whether or not you at this time have been able to negotiate a contract with the Teamsters Union having jurisdiction at the loading points covering the union drivers and which contract has a no strike clause. * * * A. After investigation I did make an agreement with the union whereby there would not be any stoppage for any reason, such as we had during the war. This will be referred to arbitration and there will never be any stoppage." He further testified that Smithco had no terminal facilities of its own but just used the terminal of this one shipper, Sanitary, which is the only shipper he presently has any business with. While presently it is hauling only fluid ·milk for Sanitary it is willing to obtain any needed refrigerated trucks to haul Sanitary's milk by-products, which are presently being hauled, either by Sanitary's own trucks, or occasionally on week days by a common carrier. On cross-examination, he stated that there were a large number of trucks furnishing dairy service between Kansas City, St. Louis and Columbia in the transportation of bulk milk products. He didn't know how many carriers had certificates to haul bulk commodities to and from all the places named in Smithco's application. He was asked about the meaning of paragraph 4 of this application and replied: "My interpretation is we are asking authority to transport milk and other dairy products between these various points, one on one hand and one on the other, as it is needed, or on an irregular run, meaning it isn't a scheduled run, day-to-day.

"Q. But you are asking authority to operate between two points served by regular route common carriers. Is that true? A. Yes, sir."

There are seven protestants to the application of Smithco. On their behalf there was testimony that St. Louis Dairy, one of the three largest dairies in St. Louis, engaged in the pasteurizing, processing, bottling and distribution of milk for human consumption, obtains its milk from Springfield, located in the Springfield milkshed. This milk is hauled by Dairyland Transport Company, which is performing that service completely satisfactorily. According to the witness, E. L. Toennies, of the St. Louis Dairy Company, its plant is all union. Non-union haulers can unload at union plants but Mr. Toennies didn't know if a non-union hauler can get loaded at a unionized loading point.

Testimony on behalf of Protestant Frisco Transport Company was that this company is particularly interested in dairy products such as cheese and butter. It has authority to transport fluid milk but does not do so. It has no tank equipment at all. It does have about ten zero refrigerator units and sixteen insulated units with dry ice bunkers that it uses in transporting perishable commodities. It now provides service several times a day from Lebanon to St. Louis for dairy products other than those which move in tank vehicles. This is a five-day through the week service, and on emergen-

cies and on perishables it performs that service on Saturday or Sunday generally in truckload quantities as the emergency arises. It has additional trucks available as demand requires it. It also provides this service from Lebanon directly to the following towns: Rolla, Joplin, Neosho, West Plains, and provides a joint line service to Poplar Bluff, Cape Girardeau, Jefferson City, Columbia and Sedalia.

Testimony on behalf of Protestant Powell Brothers, also a certificate of convenience and necessity holder, was that it renders general commodity service to Springfield, Kansas City, St. Louis, Joplin, Neosho, and Bolivar. It has refrigerated equipment for moving cheese, butter, and other milk products between those points. It desires additional traffic and is not running at capacity. It provides a daily service Monday through Friday, and has never been called on for service on Saturday or Sunday. It is willing to provide Saturday and Sunday service to applicant if it could get forty to fifty per cent of a truckload, and would move as small a load of cottage cheese on Saturday or Sunday as 12,000 pounds, but none smaller.

Testimony on behalf of Protestant Campbell Sixty-Six was to the effect that it provided authorized hauling service to Springfield, Marshfield, Lebanon, Ozark, Aurora, Monett, Mount Vernon, Bolivar, Buffalo, Eldon, Kansas City, St. Louis, Jefferson City, Rolla, Joplin and Neosho, including dairy service the five week days between Lebanon and St. Louis. It has sixteen fully insulated units. It holds itself out to haul any type of dairy products. It has had no request from applicant to haul any cheese, butter, or other such products. It is in position to haul these products and would haul them on request on Saturdays and Sundays as well as week days. It would haul as small an amount as half a load, or 7,000 pounds on advance notice to its dispatcher so it could make its equipment available. There was also testimony that such products can be stored under refrigeration one place as well as another over the week end, and that most shippers for whom it hauls have facilities to store at least 500 pounds under refrigeration.

Testimony on behalf of Protestant Schien Truck Lines was that it is authorized to render general commodity service to Bolivar, Buffalo, Kansas City, St. Louis, Sedalia, Springfield, and Warsaw as well as to additional points not included in applicant's application. It does not serve Lebanon. It has refrigerated equipment and handles cottage cheese, butter and other dairy products. Its normal operation is during the five week days, but it does pick up on Saturdays and Sundays to take care of the handling of butter or cottage cheese. It serves Springfield and carries butter from and to St. Louis and Kansas City. It could transport cottage cheese, butter, plain cheese or any other type of by-product of milk at any point it presently services, and is willing to do that in small lots as desired, and on Saturdays and Sundays as well as week days as required.

Testimony on behalf of Protestant Orscheln Bros. was that it provides authorized transportation for all types of commodities, including cheese, butter and other milk products from and to Kansas City, St. Louis, Columbia and Jefferson City, as well as other places not included in applicant's request. Its regular route service goes no farther south than Jefferson City, but it has irregular route service on to the south. It furnishes a five-day service generally but is willing to furnish a seven-day service if there is a need for it and has done so quite often. While it has had no experience in hauling fluid milk it has hauled cream in cans, cheese, butter, and all types of refrigerated products. It hauls both in truckload quantity and in small quantities. It holds itself out as willing and ready to haul the products in the application of Smithco. It provides service to the public, both in regular and irregular route authority. It has 250 pieces of equipment, including 14 refrigerated trailers. Previously it has not held itself out as a carrier of fluid milk in tank trailers because it has not had the

equipment to handle it. It is now willing to buy tank trucks and engage in this specialized service of hauling fluid milk.

As a result of its hearing the Commission concluded "That until it is shown that the carrier now authorized to render service is either unable or unwilling to render satisfactory service, a new carrier should not be placed in the field, and, therefore the application should be denied." One Commissioner dissented on the ground that shipper (Sanitary) cannot effectively tender its products to Dairyland for transportation, even though Dairyland stands ready and willing to transport them, because of the union situation, a matter outside the control of both the shipper or Dairyland, and which prevents the shipper from getting its products transported in tank vehicles by the only certified carrier in the field.

On this appeal none of the parties have preserved or asserted any question of validity of a statute of the United States, or of any authority exercised under the laws of the United States, or of any other matter that would give the Supreme Court exclusive appellate jurisdiction. Constitution of Missouri, 1945, Art. 5, Sec. 3, V.A. M.S. Appellant's first contention is purely one of statutory construction to determine whether or not Congress, through its enactment of the Federal Marketing Agreement Act and Order No. 3 issued thereunder, has pre-empted the field of regulation of price of milk and its marketing conditions so as to preclude the State of Missouri through its Public Service Commission from requiring a certificate of convenience and necessity, and regulating the public carrier rates of those desiring to haul milk intrastate from the producer's (farmer's) cooperative to the Federal Marketing Area. While appellant cites and relies principally upon federal cases involving constitutional questions, it concedes that it does not raise any constitutional question on this appeal. We find that this court has jurisdiction.

We proceed to consider appellant's first contention that Congress by the enactment of the Federal Marketing Agreement Act of 1937 has pre-empted the field and thereby precluded jurisdiction of the Public Service Commission.

At the outset we acknowledge considerable difficulty in stating precisely any abstract formula or criterion that will resolve the question. As stated by Mr. Justice Frankfurter in the case of Amalgamated Clothing Workers of America v. Richman Brothers, 348 U.S. 511, 75 S.Ct. 452, 455, 99 L.Ed. 600: " 'The areas that have been pre-empted by federal authority and thereby withdrawn from state power are not susceptible of delimitation by fixed metes and bounds.' [Weber v. Anheuser-Busch, Inc.] 348 U.S. [468] loc. cit. 480, 75 S.Ct. [480], loc. cit. 487 [99 L.Ed. 546]. What is within exclusive federal authority may first have to be determined by this Court to be so." Nonetheless, the question is now before us, and we must determine it as best we can.

We refer to certain United States Supreme Court cases for their statement of the factors to be considered. In Penn Dairies v. Milk Control Commission, 318 U.S. 261, 63 S.Ct. 617, 623, 87 L.Ed. 748, the United States Supreme Court said: "An unexpressed purpose of Congress to set aside statutes of the states regulating their internal affairs is not lightly to be inferred and ought not to be implied where the legislative command, read in the light of its history, remains ambiguous. Considerations which lead us not to favor repeal of statutes by implication, (citations omitted) should be at least as persuasive when the question is one of the nullification of state power by Congressional legislation. * * * Furthermore we should be slow to strike down legislation which the state concededly has power to enact, because of its asserted burden on the federal government. For the state is powerless to remove the ill effects of our decision, while the national government, which has the ultimate power, remains free to remove the burden."

In Schwartz v. State of Texas, 344 U.S. 199, 73 S.Ct. 232, 235, 97 L.Ed. 231, 235,

Mr. Justice Minton said: "If Congress is authorized to act in a field, it should manifest its intention clearly. It will not be presumed that a federal statute was intended to supersede the exercise of the power of the state unless there is a clear manifestation of intention to do so. The exercise of federal supremacy is not lightly to be presumed. 'The principle thus applicable has been frequently stated. It is that the Congress may circumscribe its regulation and occupy a limited field, and that the intention to supersede the exercise by the state of its authority as to matters not covered by the federal legislation is not to be implied unless the Act of Congress fairly interpreted is in conflict with the law of the State.' Atchison, T. & S. F. R. Co. v. Railroad Commission of State of California, 283 U.S. 380, 392–393, 51 S.Ct. 553, 556, 75 L.Ed. 1128. See Savage v. Jones, 225 U.S. 501, 533, 32 S.Ct. 715, 726, 56 L.Ed. 1182.

" 'It should never be held that Congress intends to supersede, or by its legislation suspend, the exercise of the police powers of the states, even when it may do so, unless its purpose to effect that result is clearly manifested.' Reid v. State of Colorado, 187 U.S. 137, 148, 23 S.Ct. 92, 96, 47 L.Ed. 108."

For other expressions of the tests or criterion to be used in determining whether or not, and to what extent, a federal statute is to be deemed to have occupied a particular field otherwise open to state regulation, see 60 Harvard Law Review, "Occupation of the Field" in Commerce Clause Cases, page 262; Atchison, Topeka and Santa Fe Ry. Co. v. City of Chicago, D.C., 136 F.Supp. 476; Hill v. State of Florida, 325 U.S. 538, 65 S.Ct. 1373, 89 L.Ed. 1782; Smith v. Thompson, Mo.Sup., 182 S.W.2d 63, 67.

Turning to the Act itself: "§ 601. It is declared that the disruption of the orderly exchange of commodities in interstate commerce impairs the purchasing power of farmers and destroys the value of agricultural assets which support the national credit structure and that these conditions affect transactions in agricultural commodities with a national public interest, and burden and obstruct the normal channels of interstate commerce."

Section 602 provides: "It is declared to be the policy of Congress—(1) Through the exercise of the powers conferred upon the Secretary of Agriculture under (certain) Sections * * * of this title, to establish and maintain such orderly marketing conditions for agricultral commodities in interstate commerce as will establish, as the prices to farmers, parity prices as defined by Section 1301(a) (1) of this title."

608c (1) "The Secretary * * * shall * * * issue * * * orders applicable to processors, associations of producers, and others engaged in the handling of any agricultural commodity or product thereof * * *. Such persons are referred to (herein) as 'handlers.' "

608c (5) "In the case of milk and its products, orders issued pursuant to this section shall contain one or more of the following terms and conditions, and (except as provided in subsection (7) of this section) no other: (A) Classifying milk * * and fixing, or providing a method for fixing, minimum prices * * * which all handlers shall pay * * * for milk purchased from producers or associations of producers. Such prices shall be uniform as to all handlers, subject only to adjustments for (1) volume, market, and production differentials customarily applied by the handlers subject to such order, (2) the grade or quality of the milk purchased, and (3) the locations at which delivery of such milk, or any use classification thereof, is made to such handlers."

B. "Providing: * * * (ii) For the payment to all producers and associations of producers delivering milk to * * * handlers * * * of uniform prices for all milk so delivered, irrespective of the uses made of such milk * * * subject * * * only to adjustments for * * * (c) the

locations at which delivery of such milk is made."

F. "Nothing contained herein * * * shall be construed to prevent a cooperative marketing association * * * from blending the net proceeds of all of its sales * * * and making distribution thereof to its producers in accordance with * * * (its contract with its producers) Provided, That it shall not sell milk or its products to any handler for use or consumption in any market at prices less than the prices fixed (pursuant to this law) for such milk."

608c (7) referred to above provides that orders shall contain provisions prohibiting unfair methods of competition, and unfair trade practices, in the handling of milk and provisions incidental to, and not inconsistent with, the terms and conditions specified in sub-sections (5)–(7) of this Section and necessary to effectuate the other provisions of this order. 608(c) (18) provides that in establishing the parity price as to milk, the Secretary of Agriculture shall consider the price of feeds, the available supply of feeds, and other economic conditions which affect market supply and demand for milk, or its products, in the appropriate marketing area and fix prices to reflect those factors. He is to make amendments accordingly as circumstances change.

■ Thus, the Agricultural Marketing Agreement Act does not include public transportation carriers within its provisions of subjects or commodities to be regulated. As stated in the dissenting opinion in Stark v. Wickard, 321 U.S. 288, 316, 64 S.Ct. 559, 574, 88 L.Ed. 733: "The statute as an entirety makes it clear that obligations are imposed on handlers alone." It is likewise clear from the language contained in the Act, and also from that contained in Order No. 3 issued thereunder, that the term "handlers" does not include the common carrier that transports the particular product.

■ Therefore, we must pass to appellant's contention that although the Act does not specifically apply to public carriers, it does evidence the intention of Congress to so occupy the entire field concerning the economic factors affecting the marketing conditions of this milk, including transportation and cost thereof, as to preclude the Public Service Commission of Missouri from requiring a carrier of milk and milk products in intrastate commerce from engaging in such operation unless it first obtains a state certificate of convenience and necessity and subjects itself to reasonable rate regulation. In support of this contention, appellant says, the fact that Congress in the Act did not specifically include common carriers within the terms thereof indicates a congressional intent that such common carriers should be free of all regulation. It cites East Texas Motor Freight, Lines, Inc. v. Frozen Food Express, 351 U.S. 49, 51, 76 S.Ct. 574, 100 L. Ed. 917, in support of its contention that Congress by another statute having specifically exempted all motor vehicles carrying agricultural products in interstate commerce from regulation by the Interstate Commerce Commission (49 U.S.C.A. § 303 (b) (6)), has clearly evidenced a general purpose to leave such carriers free of both federal and state regulation.

We are unable to agree with appellant's reasoning in this respect. It appears to us to be just as plausible that if Congress desired to oust the state from its otherwise admitted right through its Public Service Commission to require common carriers carrying milk and milk products in intrastate commerce under the circumstances appearing in this case to secure a certificate of convenience and necessity, and to subject themselves to commission determined rate schedules, it would have said so just as it specifically did with regard to the Interstate Commerce Commission on interstate hauls. Certainly, Congress must have known in 1937 when it enacted the Agricultural Marketing Agreement Act of the applicable Missouri statute enacted in 1927 giving the Missouri Public Service Commission jurisdiction over common carriers in intrastate

·commerce, and providing for certificates of ·convenience and necessity and rate regulation.[4] Appellant's contention is not persuasive, and we are unable to find the expression of any clear intent in the statute to preempt from the state its otherwise admitted jurisdiction over its intrastate carriers.

 Appellant's next argument in support of its pre-emption contention, in effect, is that the State of Missouri through its Public Service Commission might establish a transportation rate that would be in excess of the zone differential established by the Secretary, or less than that zone differential, and thus unduly interfere with the objects of the Federal Act. This is not a rate case. The Public Service Commission has not yet established any hauling rate for appellant. We are unwilling to presume that, if and when it does establish a rate, such rate will be either above or below that provided in Order No. 3 as the zone differential which the handler may withhold from the purchase price of the milk. Keeping in mind that the common carrier is free of all regulation so far as the specific terms of the Act and Order are concerned, and that the act and order do not undertake to say anything directly about common carriers or their rates, we do not believe that the Federal Act, by some form of implication, should be interpreted to subject such intrastate carriers to the exact zone differential established by the Secretary for handlers (not common carriers). It would have been easy for Congress to have included within the terms of the Act those who transport the milk or other farm commodities. If Congress deems their regulation necessary to the Congressional purpose, it still may do so. It may well be that Congress is satisfied to leave the subject of rate regulation of these public carriers entirely in state hands where it has customarily been, or to leave it free of all regulation if the state does not wish to regulate it. Cf. Eichholz v. Public Service Commission, 306 U.S. 268, 274, 59 S.Ct. 532, 535, 83 L.Ed. 641. We find nothing in the Act concerning regulation of certain of the marketing conditions affecting milk that indicates to us that Congress impliedly intended that these intrastate carriers be free of state regulation of the nature here involved. We do not have before us any specific charge by appellant that the regulation undertaken by the State of Missouri through its Public Service Commission is of such a nature and effect as to place an undue burden on interstate commerce, and thus be unconstitutional.[5] Our question as presented by the parties as we have earlier emphasized, and again emphasize, is solely one of statutory construction to determine if pre-emption of the field in question has resulted from the passage of the particular federal statute.

Appellant cites and relies particularly upon such cases as United States v. Wrightwood Dairy Co., Inc., 314 U.S. 605, 62 S.Ct. 362, 86 L.Ed. 486; Pevely Dairy Co. v. United States, 8 Cir., 178 F.2d 363, certiorari denied 339 U.S. 942, 70 S.Ct. 794, 94 L.Ed. 1358; United States v. Rock Royal Co-operative, Inc., 307 U.S. 533, 59 S.Ct. 993, 83 L.Ed. 1446; H. P. Hood & Sons, Inc., v. Du Mond, 336 U.S. 525, 69 S.Ct. 657, 93 L.Ed. 865; and East Texas Motor Freight Lines, Inc., v. Frozen Food Express, 351 U.S. 49, 76 S.Ct. 574, 100 L.Ed. 917. None of these cases involve construing a Federal Act to determine whether or not it has pre-empted a particular field. All involve constitutional questions as to whether or not certain acts by a state have placed an undue, discriminatory, or otherwise unlawful burden upon interstate commerce. We do not undertake to separately

---

4. Session Laws 1927, page 402. See also Atlantic-Pacific Stages v. Stahl, D.C., 36 F.2d 260, 261.

5. We acknowledge that a state may not license and regulate the rates of an intrastate carrier in such a way as to unduly interfere with or otherwise improperly burden interstate commerce. No such constitutional question and no such contention is made here by appellant, whose factual argument is made only to illustrate its contention that Congress had pre-empted the field.

analyze and distinguish each case in view of the large number cited.

Appellant especially refers to language in the case of United States v. Wrightwood Dairy Co., Inc., supra, as holding that Congress intended to vest in the Secretary of Agriculture authority over intrastate products to the full extent of the commerce power. As we view that case, we believe it indicates only that Congress has exercised its full power *in the field it has designated and to the extent it has designated* over, not only interstate movements of milk, but also intrastate movements of milk where such intrastate movements so directly affect the interstate movements as to give federal jurisdiction thereof under the Commerce Clause Const. art 1, § 8, cl. 3. We do not believe that the Court meant by its language to broaden the class of subjects encompassed by the statute to include public carriers or haulers who are in no way mentioned therein.[6]

■ Appellant's second contention is that the Commission has no jurisdiction of the subject matter because of the exemption provisions of Section 390.030 RSMo 1949, V.A.M.S. Protestant Dairyland suggests that appellant is estopped to question respondent's jurisdiction since it subjected itself to that jurisdiction by applying for the certificate. However, appellant was denied the requested permit by respondent, and has not received any benefit therefrom. Under such circumstances, neither the filing of the application for the certificate

of convenience and necessity, nor the commission's attempted exercise of jurisdiction as to same can supply jurisdiction over the subject matter thereof if otherwise such jurisdiction is lacking. State ex rel. Crown Coach Co. v. Public Service Commission, 239 Mo.App. 198, 185 S.W.2d 347, 357; Buck v. Kuykendall, 267 U.S. 307, 45 S.Ct. 324, 69 L.Ed. 623.

Section 390.030 provides: "The provisions of sections 390.011 to 390.176 (which otherwise give stated jurisdiction to the Public Service Commission over motor carriers) shall not apply to: * * *

"4. *Motor vehicles while being used exclusively to transport:*

"(1) Stocker and feeder livestock from farm to farm, or from market to farm;

"(2) *Farm or dairy products* including livestock *from a farm or dairy to a creamery, warehouse or other original storage or market;*

"(3) Agricultural limestone or fertilizer to farms; or,

"(4) Property from farm to farm." (Italics ours.)

Recognizing that the Public Service Commission is a creature of statute, and that its jurisdiction in the respect here in issue is controlled by statute [7] appellant's contention is that the Missouri legislature, motivated much as Congress was in specifically exempting all motor vehicles carrying agricultural products in interstate commerce

---

6. This Act has apparently left untouched for proper state regulation many things that might affect the transportation, handling, or ultimate price of milk, such as highway safety requirements for trucks carrying milk, the cost of feed for the dairy herds, sanitary regulations concerning milk, etc. See H. P. Hood & Sons v. Du Mond, 336 U.S. 525, 69 S.Ct. 657, 671, 93 L.Ed. 865; "* * * the Federal Act does not preclude a state from placing restrictions and obstructions in the way of interstate commerce for the ends and purposes always held permissible under the Commerce Clause."

7. Prior to April 5, 1927, the Public Service Commission had no control over common carriers by motor busses. By the terms of the law then enacted it acquired jurisdiction over them in certain respects. Atlantic-Pacific Stages v. Stahl, D.C., 36 F.2d 260, 261; Session Laws, 1927, page 402. On May 6, 1931, this act was amended to provide a new section which read in part: "The provisions of this act shall not apply to * * motor vehicles used exclusively in transporting farm and dairy products from the farm or dairy to warehouse, creamery, or other original storage or market; * *." Laws 1931 p. 306.

from regulation by the Interstate Commerce Commission, (49 U.S.C.A. § 303(b) (6)), "in order to preserve for the farmers the advantage of low cost motor transportation," exempted such vehicles from regulation by the Missouri Public Service Commission.[8] Appellant reasons that the legislature specifically excluded these vehicles used exclusively to transport farm and dairy products from either the farm or dairy to market, intending to provide for the unrestricted movement of dairy products whether going from a farm or a dairy to a creamery, warehouse or market.[9] It states that as to fluid milk there can be no question but that its transportation in such vehicles from the producers farm to the federal market is exempt under the statute. It contends its plant at Lebanon is the "dairy" referred to in the statute but that in any event the haul of fluid milk from a farm via its Lebanon plant to the Federal Marketing Area in vehicles while being exclusively so used is exempted from regulation by the statute.

Appellant also says that the legislature by extending the statutory exemption to include all "dairy products" must authorize their movement from the place where "dairy products" are ordinarily processed (not manufactured), namely, a dairy. Consequently, the exemption is of all dairy productions, including chilled milk, moving from the farmers' dairy[10] at Lebanon to the "market"—that is, to the bottling and pasteurizing dairy in St. Louis where the unpasteurized milk is sold by the farmer-producers.

Protestant Dairyland and Respondent Public Service Commission contend that the exempting section of the statute reveals an entire plan by the legislature to exempt only those hauls from farm to farm, farm to market or market to farm.[11] They refer also to the Webster dictionary definiton of "dairy"[12] and note that appellant's selection of meaning therefrom is the fourth and last given one. They claim the second and third given definitions are the ones embodying the legislative intent; namely, "2. The department of farming or of a farm that is concerned with the production of milk, butter, and cheese. 3. Hence, a dairy farm; also the cows of a farm." Thus, they conclude the hauls here in question are not from a farm or dairy farm and thus are not ex-

---

8. East Texas Motor Freight Lines, Inc., v. Frozen Food Express, 351 U.S. 49, 51, 76 S.Ct. 574, 576, 100 L.Ed. 917, 922: "The exemption of motor vehicles carrying 'agricultural (including horticultural) commodities (not including manufactured products thereof)' was designed to preserve for the farmers the advantage of low-cost motor transportation. See especially 79 Cong.Rec. 12217. The victory in the Congress for the exemption was recognition that the price which the farmer obtains for his products is greatly affected by the cost of transporting them to the consuming market in their raw state or after they have become marketable by incidental processing."

9. See Schwartzman Service v. Stahl, D.C., 60 F.2d 1034, 1037–1038 for a statement of the Governor of Missouri's reasons for requesting the legislature to pass the Missouri Act.

10. Appellant says that since Sanitary is not the purchaser of the milk but is the producer-owned non-profit marketing association by which the producers (farmers) themselves sell their product in the Federal Marketing Area at St. Louis, that which occurs at the Lebanon plant may be considered as "an extended farm operation," so considered by farm authorities.

11. Cf. Schwartzman Service v. Stahl, D.C., 60 F.2d 1034. Stage ex rel. Wisconsin Allied Truck Owners' Ass'n v. Public Service Commission of Wisconsin, 207 Wis. 664, 242 N.W. 668, 675; Elgin Storage & Transfer Co. v. Perrine, 2 Ill.2d 28, 116 N.E.2d 868.

12. "1. A place, room, or house where milk is kept and converted into butter and cheese. 2. The department of farming or of a farm that is concerned with the production of milk, butter and cheese. 3. Hence, a dairy farm; also the cows of a farm. 4. An establishment for the sale and distribution of milk or milk products."

empt.[13] Secondly, they contend that the Lebanon Co-operative is a creamery; a place of original storage and a place of original market. They refer to Webster's definition of "creamery": "1. An establishment where butter and cheese are made or where milk or cream are sold or prepared for market" as accurately describing the Lebanon Co-operative. Respondent Public Service Commission also refers to its interpretation of the Missouri Bus and Truck Law of 1931 promulgated by it on November 27, 1933, as being its long accepted and correct one; namely: "As to when the status of goods being transported ceases to be farm-to-market, the 'rule of thumb' adopted by the Commission is that goods are entitled to one free haul, for example, when cream is transported from the farm to the creamery or milk station and then picked up and carried by another carrier or for another owner to its ultimate destination, the second haul is not exempt."

■ All this, of course, just illustrates and emphasizes our duty, which is to ascertain the legislative intent in the use of these words in the exempting statute. In this regard the primary rule of construction of statutes is to ascertain the lawmaker's intent, from the words used, if possible; and to put upon the language of the legislature, honestly and faithfully, its plain and rational meaning and to promote its object; and the manifest purpose to the statute, considered historically, is properly given consideration. Lawyers' Association of St. Louis v. City of St. Louis, Mo.App., 294 S.W.2d 676, 681; State ex rel. Spink v. Kemp (en banc), 365 Mo. 368, 283 S.W.2d 502; Cummins v. Kansas City Public Service Co., 334 Mo. 672, 66 S.W.2d 920, 925.

Appellant has limited its contention of lack of jurisdiction on the part of the Missouri Public Service Commission to those vehicles while being used exclusively in making the described hauls of fluid milk from the farm via its Lebanon plant to St. Louis in the Federal Marketing Area. While the record is silent as to who hauls the milk from the farm or dairy farm to the co-operative, it is apparent from the record that appellant does not perform that service but rather it is the second hauler, who after the milk has been delivered to the co-operative at Lebanon and there tested, weighed, intermingled and cooled, and possibly a part thereof held back for processing into cheese or butter, transports the milk from the co-operative at Lebanon to the Federal Marketing Area. It is this separate second haul by appellant that is in question here.

■ An examination of the other exemptions of sub-section 4 of the statute discloses that they all concern hauls either to or from a farm. It is in this context that we find the phrase "farm or dairy". It is in this context that the legislature used these words. We believe that the dictionary definition of the key word "dairy" ("farm or dairy") that best reflects the legislative intent is not the last given one as appellant contends, but rather the second and third; namely, that the "farm or dairy" mentioned in the statute means a farm concerned with farm products generally or a farm that is concerned with the production of milk, butter and cheese; hence a farm or a dairy farm. Such meaning is in keeping with the intent expressed in the other three paragraphs of sub-section 4 of the statute, and is in harmony with what appears to be the general purpose of the statute. To say the legislature intended the broad definition of "dairy" last given in the dictionary and contended for by appellant; namely, "an establishment for the sale and distribution of milk or milk products" would mean that hauls of milk or milk products from such places as our modern wholesale and retail dairies that sell milk, cheese, ice cream, and other milk products would be exempt. Such a construction of the legislative intent to our minds would be unreasonable and emphasizes our view that it was only the haul

13. Cf. Voss Bros. Dairy v. Gardner, 195 Okl. 118, 155 P.2d 727, 728.

from the farm, or the farm concerned with the production of milk (butter and cheese), that was contemplated by the legislature in using the questioned language.

■ Also, when there is doubt and ambiguity as to the meaning of a statute we should, and do, give consideration to the practical construction placed upon the act by the agency charged with its administration, although, such construction is not binding upon the court. State ex rel. McAllister v. Cupples Station Light, Heat & Power Co., 283 Mo. 115, 223 S.W. 75, 83; State ex rel. Chick v. Davis, 273 Mo. 660, 201 S.W. 529; Timmonds v. Kennish, 244 Mo. 318, 149 S.W. 652; Rathjen v. Reorganized School District R-11 of Shelby County, 365 Mo. 518, 284 S.W.2d 516; Lemasters v. Willman, Mo.App., 281 S.W. 2d 580; Kansas City v. Travelers Insurance Co., Mo.App., 284 S.W.2d 874. As respondent has advised, in November, 1933, it adopted its so-called "rule of thumb" as to when the status of goods being transported ceases to be farm to market within the meaning of the Act. Our holding is consistent with this rule which has embodied the announced policy of the Commission for approximately 23 years. Furthermore, we note that the exempting provisions of the statute have been amended from time to time through the years since 1933 without any change being made by the legislature of the particular language here in question.[14]

As to appellant's contention that the Lebanon Co-operative is but an extension of the "farm operation" in that it but collects the milk for its producer-members,

weighs, tests, intermingles, cools it and arranges its transportation to market, we are compelled to say in spite of this view of its function, under the evidence it is nonetheless not a "farm" or "dairy farm" and thus the hauls from it to the Federal Marketing Area are not within the meaning of the statutory exempting language.

Having reached the view that the co-operative plant at Lebanon is not a "farm or dairy" within the meaning of the Statute, it is unnecessary to examine Protestant Dairyland and respondent's contention that such plant is a creamery; that the haul from the producer-farmer's farm to it is a haul from a farm to a creamery; thus ending the only haul that is exempt under the statute from Public Service Company jurisdiction.

Appellant's final contention is that the Commission's order erroneously prescribed fault of the existing carrier as the determining test of public need, and was, therefore, unreasonable and unlawful. It further says there is no statutory requirement that Sanitary tender the milk to Dairyland; that such tender would be useless as (1) Dairyland refused to haul the milk unless paid a prohibitive rate fixed by the Public Service Commission in violation of Order No. 3, and (2) irrespective of the rate, Dairyland could not get the milk loaded, and, therefore, could not move it. It states, "It is not a question of whether Dairyland's inability to render the service is the fault of Dairyland or someone else. The only question is: Does the uncontradicted record show that Dairyland cannot render the service?"

---

14. It is sometimes held that re-enactment of a particular portion of a statute without change may indicate legislative approval of a prior administrative construction of that portion. 82 C.J.S. Statutes § 370b(2), page 848; Cf. Missouri Pacific Ry. Co. v. Hellmich, 8 Cir., 12 F.2d 978, certiorari granted 273 U.S. 678, 47 S.Ct. 102, 71 L.Ed. 835, reversed 273 U.S. 242, 47 S.Ct. 395, 71 L.Ed. 628; Robertson v. Manufacturing Lumbermen's Underwriters, 346 Mo. 1103, 145 S.W.2d 134.

As to the exemption in question, it was enacted as follows:

Laws Missouri 1931, Sec. 5265, page 306 (Enacted)

Laws Missouri 1937, Sec. 5265, page 439 (Re-enacted)

Laws Missouri 1945, Sec. 5721, page 1207 (Re-enacted)

Laws Missouri 1947, Sec. 5721, page 391 (Re-enacted)

Laws Missouri 1951, Sec. 390.030, page 550 (Re-enacted)

Protestant Dairyland replies that the real basis of Sanitary's failure to use Dairyland is (1) Sanitary will not abide by a tariff (2) it expects preferential treatment. To this inferentially may be added (3) Sanitary's reluctance to do business with a carrier hauling for one of its competitors. Protestant Dairyland also claims that Smithco made the mistake of applying for common carrier authority and its evidence shows (1) it is now engaged in unlawful hauling for it has no certificate (2) it has promised its sole shipper contract carrier service (3) it does·not intend to be bound by tariffs required by law (any one of which protestant says justifies a refusal of its request for a certificate) and (4) it has not attempted to prove a need for its services, other than for those hauls from the co-operative to the Federal Marketing Area, and even as to those hauls it has failed to satisfy its burden of proof of showing that the order of the Commission is unreasonable and illegal. Respondent Public Service Commission claims its order is based on competent and substantial evidence, and that upon this record it had the discretionary power to deny issuance of the certificate.

■■■■ It is well-settled that upon an appeal to this court from a review by the circuit court of an order of the Public Service Commission the only question that the circuit court could determine on the writ of review, and that this court can determine on appeal concerning the merits of the case, is whether or not the order or decision of the Public Service Commission is reasonable and lawful. Section 386.510 RSMo 1949, V.A.M.S.; State ex rel. Kansas City v. Public Service Commission, 362 Mo. 786, 244 S.W.2d 110, 117; State ex rel. Denton v. Public Service Commission, Mo.App., 277 S.W.2d 684; State ex rel. Middlewest Freightways, Inc., v. Public Service Commission, Mo.App., 261 S.W. 2d 252, 253. Further, as a reviewing court, we may not substitute our own judgment on the evidence for that of the Commission, but must remain within our authorization

which is to decide whether or not the Commission upon consideration of all the evidence before it could have reasonably have made its findings and reached its announced result; and to set aside decisions clearly contrary to the overwhelming· weight of the evidence. State ex rel. Brooks· Truck Lines, Inc., v. Public Service Commission, Mo.App., 261 S.W.2d 254; State ex rel. Middlewest Freightways, Inc., v. Public Service Commission, supra. It is· also well settled that the order of the Public Service Commission is deemed to· be prima facie lawful and reasonable, and the burden of proof rests upon appellant. as the one who is asserting that it is unreasonable and unlawful. State ex rel.. Shepherd v. Public Service Commission, Mo.App., 142 S.W.2d 346; State ex rel.. Pitcairn v. Public Service Commission,. 232 Mo.App. 609, 110 S.W.2d 367, 370.

Turning to the evidence, we note that Sanitary (upon whose testimony appellant relies) through its manager's testimony indicates numerous reasons why it believes. that none of the other carriers, and particularly Dairyland, can render the needed service. In substance they are: (1) its need· for its carrier's trucks to be available to its plant on a moment's notice; (2) its need for a carrier that is both unionized and· satisfactory to its inside employees' union;. (3) its feeling that (as the record indicates) even though its equipment is the same type as Dairyland's, nonetheless, it is not fully satisfactory; (4) its feeling that it is entitled to a carrier other than one serving its competitor so as to give it unquestioned loyalty and avoid risk of loss of confidential business data to a competitor; (5) its feeling that Dairyland's hauling rates are too high; and (6) its general feeling that "the service they (mainly Dairyland) had available was not in accordance with our requirements but it was on their own terms and provisions."

■■■■ As shown by the record these views appellant relies upon are in the main but conclusions, some of which bear on the

question of whether or not the present carrier service is available and sufficient, and some of which bear only on the question of whether or not the present carrier service is personally desirable to Sanitary. Looking briefly at each of them, we find that with regard to (1) there is nothing in the record to compel a finding that a carrier's trucks must be based either at Sanitary's plant or nearer to it than Springfield, Missouri, in order for the needed service to be reasonably available. As to (2) the only testimony to support Sanitary's contention its employees would not load Dairyland's trucks were the statements made by Dairyland's manager to the effect that some of Dairyland's employees in the past had said that they would not load a truck driven by non-union personnel. We do not believe it necessary in this opinion to consider whether or not this might be an unfair labor practice; or in any event, one upon which appellant is not entitled to rely for support that the present carrier service is not sufficient and that it is in the public interest for an additional carrier to be authorized.[15] For at most it is only hearsay testimony as to something that might occur if the occasion arose. In our view the Public Service Commission did not act arbitrarily in not being satisfied with this attempted showing by appellant of need for an additional carrier in the public interest. As to (3) the testimony in the main was Sanitary's manager's personal conclusion, and it falls far short of being a satisfactory showing that Dairyland's equipment is not or would not be suitable and sufficient for the contemplated service. Number (4) is but the statement of Sanitary's manager that it would personally prefer a carrier of its own choosing that did not do any hauling for a competitor. This is not a showing of any proper basis for the issuance of the requested certificate. Number (5) is a statement of Sanitary's manager's feeling that the rates authorized for Dairyland are too high. Obviously, this is not a proper ground for the issuance of the requested certificate. Number (6) is but a broad personal conclusion of Dairyland's management, and, as such, is not a satisfactory factual showing of any ground for invalidating the order of the Public Service Commission.

■ We next consider appellant's contention that there is no statutory requirement that Sanitary must first tender the milk to Dairyland to properly show Dairyland cannot provide the service needed. We recognize that there may be situations where a tender clearly would be useless, and the law does not favor requiring useless acts. However, we are unwilling to say that under the peculiar facts of this case a tender of the business would have had no probative value toward showing whether or not the carrier or carriers presently in the field could and would render the necessary service. Further, we note that at most the Commission only impliedly suggested that Dairyland should have made a tender in order to have clearly satisfied its burden of proof.[16] The Commission did not say it actually required a tender, and that a failure to tender was the reason for its refusal of the certificate. Rather it said in its findings and order: "The only test is whether the carrier (already in the field) is rendering or is ready, willing and able to render the service which it is supposed to render under the authority granted by the Commission." We agree that

---

15. Protestant Dairyland in its brief claims this is a secondary boycott that is illegal under both the Missouri Constitution and the National Labor Relations Act, 29 U.S.C.A. § 151 et seq. In any event, it says, it is not a proper criterion for determining whether or not there is already in the field a carrier that is ready, able and willing to perform the needed service.

16. The exact language of the Commission in its Report and Order is: "There is no evidence that the Dairyland Transportation Corporation was contacted with reference to the transportation of fluid milk from Lebanon to St. Louis."

this is the correct test. We do not find arbitrary conduct on the part of respondent in suggesting under the circumstances of this case, as it has in other cases,[17] that a tender of the business should have been made.

Thus, we have concluded that we cannot say on the entire record in this case that the findings and order of the Commission are unreasonable and unlawful. Nor in view of the record can we say that the Commission acted arbitrarily and could not reasonably have made its findings and reached the result announced in its order.

For the reasons stated in this opinion, the judgment of the learned trial judge affirming the order of the Commission and that order are hereby affirmed.

All concur.

---

17. Re. Home Oil and Gas Corporation, 2 Mo.P.S.N.C.,N.S., 91, loc. cit. 94; Re. Home Oil and Gas Co of Sikeston, 3 Mo.P.S.C.,N.S., 201; Re. K & R Transport, Inc., 3 Mo.P.S.C.,N.S., 397, 401.